JOHN J. JOYCE & another *vs.* JOHN T. DEVANEY & another.

Middlesex. December 1, 1947. — April 1, 1948.

Present: QUA, C.J., LUMMUS, DOLAN, WILKINS, & SPALDING, JJ.

*Easement. Way*, Private: extent. *Deed*, Construction.

Upon severance of a parcel of land into two lots by simultaneous deeds of such lots by the common owner, each containing the express provision that the conveyance was "together with and subject to" a right of way over a common driveway running along a part of the boundary between the lots "as shown on" a certain recorded plan, no right of way by implication arose in favor of one of the lots over any portion of the other lot outside the driveway as shown on the plan, although it appeared that, because of actual construction of the driveway in a location somewhat different from that shown on the plan and because of the location of the house on the first lot in relation to the driveway as constructed, "the only practical" access to the rear of that house lay in part over portions of the second lot outside the driveway as shown on the plan and there was "a reasonable necessity for" use of such portions, that there had been substantially such use during construction of the houses on the lots previous to the severance, and that the former common owner had intended "to grant a common driveway" of such extent as to permit the occupant of each lot access to the rear of his house without trespass.

BILL IN EQUITY, filed in the Superior Court on December 13, 1946.

The suit was heard on a master's report by *Goldberg*, J.

*R. B. Brooks*, for the plaintiffs.

*M. E. Gallagher, Jr.*, (*A. J. Kirwan* with him,) for the defendants.

SPALDING, J. The plaintiffs by this bill in equity seek to restrain the defendants from interfering with their use of a

common driveway; they also ask that their rights in the driveway be determined. The answer of the defendants included a counterclaim in which they ask that the plaintiffs be restrained from trespassing on their land. The case was referred to a master whose report, to which there were no objections, was confirmed by an interlocutory decree. The case comes here on the plaintiffs' appeal from a final decree.

We summarize the findings of the master as follows: On April 30, 1931, MacNeil Bros. Corporation, hereinafter called the corporation, acquired for development purposes a parcel of vacant land in West Medford. Thereafter it subdivided the parcel into house lots and erected houses on them. The controversy here concerns two lots which are designated as lots A and B on a plan of land dated June 10, 1931, and recorded on July 21, 1931, which was prepared for the corporation and which will hereinafter be called the Harden plan. Lot A is now owned by the defendants and lot B by the plaintiffs. The lots, which are contiguous, are bounded on the west by Auburn Street. Lot A is south of lot B. On the Harden plan a right of way is shown running from Auburn Street for a distance of eighty-five feet in an easterly direction along the boundary of the two lots. The right of way is eight feet wide, four feet of which is on each lot. At the time the corporation ordered the Harden plan to be drawn it intended that the houses which were to be erected on lots A and B should be set back twenty-five feet. On May 8, 1931, the construction of a house was commenced on lot A and on May 28, 1931, the construction of a house was started on lot B. The Harden plan was not then in existence but it had been ordered. The time required for the building of each house was approximately eight weeks. Each house when built had a built-in garage in the rear.

The defendants, in the middle of May, 1931, shortly after the construction of the house on lot A had commenced, entered into a contract with the corporation for the purchase of the house when completed. The defendants were told at that time by an officer of the corporation that there was to be a common driveway between lots A and B "for the use of automobiles to go to their respective garages at the

rear of each house." The defendants at that time had not seen the Harden plan, for it had not been drawn. They saw it, however, before they took title to the property. "It was the intention" of the corporation, "when it ordered the Harden plan to be drawn, to grant a common driveway" between lots A and B of sufficient length and width to permit the occupant of each lot to drive his automobile into his garage without trespassing on the land of the other. When completed the houses were set back forty-five feet from the sidewalk line instead of twenty-five feet as originally intended. No attempt was made to have the driveway conform to the Harden plan.

The driveway as actually laid out and as it exists today may be described as follows: There is a crushed stone driveway ten feet wide running between the lots from the street line to the end of the houses. Portions of the back yards are surfaced by the same material. The line dividing the two lots is but four feet from the house on lot B and it is eleven feet from the house on lot A. Along the sides of the houses and bordering on the driveway are concrete sidewalks thirty inches in width. One and one half feet of the driveway (the distance from the edge of the cement walk to the boundary line) is on lot B; eight and one half feet of it (the distance from the boundary line to the cement walk on lot A) is on lot A. While the construction of the two houses was in progress, the area which corresponds roughly to the existing driveway between the lots was used by the corporation "to bring materials to the job," and the back yard area was similarly used without regard to any particular boundaries. After both houses were completed, laborers spread crushed stone over the area between the two houses which had been used by the trucks during the building operations. Parts of the back yard of each house were also surfaced.

A person occupying lot B can get his automobile entirely on his own land in the rear only by driving it beyond the end of the eighty-five foot driveway shown in the Harden plan for a distance of eighteen feet. Thus it is not possible for the plaintiffs to enter their garage without trespassing

on lot A for this distance. And with the driveway as actually laid out with but one and one half feet of it on lot B, the owner of that lot cannot drive an automobile on the driveway for any distance without trespassing to some extent on lot A. The house on lot B "might have been constructed so that the common driveway. could have conformed to the Harden Plan, and have been adequate for the full enjoyment of its use." Due to the terrain and the location of the house on lot B, it would be impractical to build a driveway on the northerly side of that lot. "For the use of the existing garage [on lot B] the only practical entrance to it is by way of a portion of the presently constructed driveway, and there is a reasonable necessity for such use."

Title to the respective lots was acquired in these circumstances. On July 24, 1931, the corporation, which at that time owned both lots, conveyed lot A to the defendants and lot B to Donald MacNeil, an officer of the corporation. The conveyance of lot B to MacNeil was "a straw transaction . . . the corporation still retaining a beneficial interest therein for the purpose of finding a possible permanent purchaser." Both deeds were recorded at the same time, July 24. Each deed identified the lot conveyed with reference to the Harden plan and, after setting forth the description, recited "together with and subject to the right of way eight feet wide as shown on said plan."

On August 24, 1931, one Barrett, who had entered into negotiations with the corporation in the middle of July to purchase lot B, acquired title to it by a deed from MacNeil. Barrett owned and occupied the property until August 17, 1943, when he conveyed it to the plaintiffs. Barrett's deed and that of the plaintiffs referred to the Harden plan and contained the words "together with and subject to the right of way eight feet wide as shown on said plan."

At the time of the severance of title on July 24, 1931, it was the intention of the corporation "to grant a common driveway" eight feet wide and of sufficient length to permit the occupant of each lot to drive his automobile into his garage without trespassing on the land of the other. In

order to effectuate this intention, in view of the way the property was laid out, the right of way shown on the plan would have to be extended easterly for a distance of eighteen feet, making the total length of the driveway one hundred and three feet, and six and one half feet of it throughout its entire length would have to be on the defendants' lot.

During the twelve years that Barrett owned and occupied lot B no controversy arose between him and the defendants concerning the driveway. In October, 1946, a dispute arose between the plaintiffs and the defendants concerning the use of the driveway, and the defendants caused a survey to be made of the premises. Following the survey the defendants placed obstructions at the end of the eighty-five foot right of way which prevented the plaintiffs from driving their automobile into their own back yard. The defendants notified the plaintiffs that they were revoking the privilege, which had hitherto been extended to them, of using their land beyond the limits of the right of way unless they paid for it.

The final decree provided that the plaintiffs had "a right of way only as shown on" the Harden plan, namely, a right of way eight feet wide running easterly from Auburn Street for a distance of eighty-five feet, of which four feet was on lot B and four feet on lot A. The decree enjoined the defendants from interfering with the right of way so established, and enjoined the plaintiffs from trespassing upon the land of the defendants which lay outside of the right of way.

The decree was right.

The plaintiffs contend that the right of way designated in the Harden plan never in fact came into existence and that prior to the severance of title by the common owner such use had been made of the driveway as to indicate that it was the intention of the parties at the time the lots were conveyed to create an easement as appurtenant to lot B over so much of the present driveway as the master found to be necessary to enable the owners of that lot (the plaintiffs) to have access to the rear of their lot and garage.

Such an easement was not created by the terms of any deed under which the plaintiffs derive their title; if it exists

it must be by implication. It is familiar law that the owner of land may make use of one part of his land for the benefit of another part in such a way that upon a severance of the title an easement, which is not expressed in the deed, may arise which corresponds to the use which was previously made of the land while it was under common ownership. Restatement: Property, §§ 474, 475, 476. Tiffany, Real Property, §§ 779–782. *Gorton-Pew Fisheries Co.* v. *Tolman*, 210 Mass. 402. *Bond* v. *Orr*, 266 Mass. 475, 480. *Mt. Holyoke Realty Corp.* v. *Holyoke Realty Corp.* 284 Mass. 100. *Jasper* v. *Worcester Spinning & Finishing Co.* 318 Mass. 752, 756. The governing principles of law are set forth in the cases just cited and need not be restated.

The circumstances which give rise to an implied easement do not exist in the case before us. We have not overlooked the findings that for the use of the garage on the plaintiffs' property "the only practical entrance to it is by way of a portion of the presently constructed driveway" and that "there is a reasonable necessity for such use." "But implied easements, whether by grant or by reservation, do not arise out of necessity alone. Their origin must be found in a presumed intention of the parties, to be gathered from the language of the instruments when read in the light of the circumstances attending their execution, the physical condition of the premises, and the knowledge which the parties had or with which they are chargeable." *Dale* v. *Bedal*, 305 Mass. 102, 103. It has been said that the presumption of intent in such cases is a presumption of law which "ought to be and is construed with strictness." *Orpin* v. *Morrison*, 230 Mass. 529, 533. The deeds at the time of severance created the specific easements shown on the Harden plan. That plan was then on record. Those easements are unambiguous and definite. The creation of such express easements in the deeds negatives, we think, any intention to create easements by implication. See *Karason Co.* v. *Anglo-American Leather Co. Inc.* 136 N. J. Eq. 344; *Webber* v. *Vogel*, 159 Pa. 235, 242–244; *Hardy* v. *McCullough*, 23 Grat. 251, 260–262. Expressio unius est exclusio alterius. What the parties may have intended cannot override the language

of the deeds. The present proceedings do not seek reformation of the deeds on the ground of mutual mistake. It is true that the grantee of lot B did not, as events turned out, acquire an easement which permitted him or his successors in title to have access by automobile to the garage, but this was a matter which could readily have been ascertained by anyone purchasing the property. In any event we are not at liberty, because of this inconvenience, to presume that the parties intended to create an easement other than that which is expressly set forth in the deed. The case is a hard one but if we should hold otherwise it would be another instance of a hard case making bad law.

*Interlocutory decree affirmed.*
*Final decree affirmed with costs.*