## Town of Bedford & others[1] *vs.* Rose C. Cerasuolo, trustee,[2] & others.[3]

No. 03-P-1155.

Suffolk. May 13, 2004. - September 20, 2004.

Present: Greenberg, Porada, & Gelinas, JJ.

*Easement. Real Property,* Easement.

In an action to quiet title and to determine the existence and extent of the defendants' easement rights across a bicycle path that the plaintiff town owned, the easement created when the defendants' predecessor sold the strip of land that later became the bicycle path was an easement by necessity rather than an easement by implication, because the need to establish a way to access the predecessor's retained parcel arose only upon his conveyance of the strip of land, which rendered the retained parcel landlocked, and not from any prior course of use. [76-79]

In an action to quiet title and to determine the existence and extent of the defendants' easement rights across a bicycle path that the plaintiff town owned, the express acknowledgment in certain instruments of the existence of a previously created easement by necessity did not preclude its being considered any longer as an easement by necessity; rather, the effect of the instruments on the easement rights was a question of fact for the trial judge, who reasonably concluded that the defendants' right to use the crossing mentioned in the instruments was not fixed or limited in width by what was shown on a plan attached to the instruments. [79-81]

In an action to quiet title and to determine the existence and extent of the defendants' easement rights across a bicycle path that the plaintiff town owned, the judge in her decision did not explain what subsidiary findings supported the conclusion that a proposed ten-building apartment complex constituted a normal development of a parcel of land formerly used for agriculture, such that the concomitant increase in the scope of the crossing at issue was deemed a reasonable requirement in accommodating such use; therefore, this court remanded the matter to the Land Court for additional fact finding. [81-85]

Civil action commenced in the Land Court Department on July 17, 2001.

[1]Selectmen of Bedford.

[2]Of R.C.C. Realty Trust.

[3]Princeton Development, Inc., and Princeton Properties Management, Inc.

The case was heard by *Karyn F. Scheier, J.*

*Doris R. MacKenzie Ehrens* (*Michael C. Lehane* with her) for the plaintiffs.

*Michael Paris* (*Darren M. Baird* with him) for the defendants.

GREENBERG, J. This appeal concerns the defendants' proposed use of an easement, crossing a bicycle path owned by the town of Bedford, to provide access for the defendants' landlocked parcel on which they hope to build ten apartment buildings containing a total of 258 units. After a bench trial, a Land Court judge ruled that the private crossing shown on a 1929 plan was available for the defendants' purposes as an easement by implication, so that the defendants could use it for vehicular access to the proposed housing development and to provide connections for all utilities. The town filed this appeal. We vacate the judgment and remand for further findings.

The background facts are taken from the judge's July 11, 2003, written decision, which we supplement with undisputed matter from the record. Rose C. Cerasuolo, as trustee of R.C.C. Realty Trust, owns two parcels of undeveloped land in Bedford. Cerasuolo claims easement rights connecting the two parcels over an intersecting piece of town property, sixty-five feet in width, that formerly served as a railroad bed. When originally purchased by the Middlesex Central Railroad Company in 1873,[4] the strip of land, referred to by the parties as parcel B, had the effect of dividing a large tract of farmland held in common ownership by the seller, one Henry Wood. Wood's conveyance to the railroad left the larger of Wood's parcels, referred to as the southern parcel, landlocked. Various transfers of the northern and southern Wood parcels followed, but the two parcels, currently owned by Cerasuolo as trustee, have remained in common ownership, separated by parcel B.

While no express easement was included in Wood's original transfer of parcel B to the railroad, it appears from a subsequent plan and related documents that there evolved over the railroad bed three crossings, which connected the southern parcel to Wood's northern parcel and a public way. These crossings are

---

[4]Boston & Maine Railroad succeeded to the interest of Middlesex Central Railroad Company.

referred to as crossing A, crossing C (also described as the cattle pass), and "private crossing."

Then, in 1930, two significant instruments were executed that affected access between the northern and southern parcels. At that time, the northern and southern parcels were owned by Ervin and Ruth Monsen. On October 17, 1930, the Monsens expressly released their rights in crossings A and C to the railroad company. Included in the Monsen release, however, was an express reservation of their rights in the private crossing, as well as the right to maintain irrigation and drain pipes at the former cattle pass, or crossing C. In exchange, the railroad company granted the Monsens an easement at a new location across the railroad bed, identified as crossing B. The deed expressly described the width of crossing B as twelve feet.

Both the 1930 Monsen release and the railroad grant of crossing B make specific reference to an attached plan, dated May, 1929 (we shall refer to the three collectively as the 1930 instruments). That plan, a copy of which is appended to our opinion, shows the location of the private crossing, by dotted lines, and the new crossing B, by solid lines.[5] By the scale indicated thereon, the plan portrays the private crossing as having a width of approximately seven feet.

In 1932, John and Rose Cerasuolo acquired the northern and southern parcels on either side of the railroad bed. The trial judge found that from the time of the original Wood conveyance to the railroad until approximately 1942, the various owners used the northern and southern parcels for agricultural, residential, and personal purposes. Subsequently, from 1942 until the mid-1950's, portions of the property were rented to third parties for farming. After that, the properties were no longer actively utilized.

In 1945, the Cerasuolos subdivided the northern parcel and conveyed the portion of that property adjacent to crossing B. Since that time, the sole access from the northern parcel to the

[5]The plan is entitled "Crossing Rights and Rights in Cattle Pass in Bedford, Mass., Seldon D. Gates and Ervin M. Monsen to Boston and Maine Railroad, Boston and Maine Railroad to Seldon D. Gates and Ervin M. Monsen, W.F. Cummings, Asst. Chief Eng'r., May 1929." A scale of 1 inch to 100 feet is indicated on the plan.

southern parcel has been by way of the private crossing. The northern parcel now consists of approximately four acres, and the southern parcel, approximately forty acres.

The town purchased parcel B from the railroad in 1963. According to the trial record, the property has since been used as a bicycle path and hiking trail. The record also indicates that the trail is part of the Reformatory Branch Trail, which runs from South Road in Bedford to the Concord River in Concord Center.

In 1989, presumably after the death of John Cerasuolo, Rose Cerasuolo conveyed her two parcels to herself, as trustee of R.C.C. Realty Trust. In 2000, Cerasuolo, as trustee, entered into a purchase and sale agreement with Princeton Development, Inc., and Princeton Properties Management, Inc. (together, Princeton), for the northern and southern parcels. Princeton seeks to construct an affordable housing complex on the southern parcel, purportedly pursuant to G. L. c. 40B, §§ 21-23. In order to provide access from the public road, located along the northern parcel, to the proposed housing development, Princeton seeks to expand the existing private crossing to twenty-four feet in width. According to the testimony of the town's public works engineer, the 258 apartments would generate an estimated 1,680 vehicle crossings per day at the location of the private crossing. The defendants also intend to use the private crossing easement for water, sewer, and electrical connections for the apartment complex.

The town brought this declaratory action in Land Court to quiet title and to determine the existence and extent of the defendants' easement rights across parcel B. Only the easement rights are the subject of this appeal.

1. *Type of easement.* At trial, the parties stipulated that an "easement by necessity was implied" across parcel B, but they do not appear to have reached agreement as to what that phrase signified. On appeal, the town argues that the judge incorrectly labeled the private crossing an easement by implication and that, based on this erroneous characterization, she afforded the defendants rights in the crossing that were far too expansive.

The town maintains that an easement by necessity was created across parcel B when the Wood parcel was first severed. "An easement is said to arise (or be implied) by necessity when

a common grantor carves out what would otherwise be a landlocked parcel." *New England Continental Media, Inc.* v. *Milton*, 32 Mass. App. Ct. 374, 378 (1992). "Easements by necessity" refer to rights-of-way presumed at common law when a landowner conveys a portion of his land but still needs access over the transferred property to reach the property he retained. *Leo Sheep Co.* v. *United States*, 440 U.S. 668, 679 (1979). See, e.g., *Chase* v. *Perry*, 132 Mass. 582, 584-585 (1882) (right of way by necessity over a plaintiff's lot to a defendant's landlocked parcel); *Richards* v. *Attleborough Branch R.R. Co.*, 153 Mass. 120, 121-122 (1891) (after executing an express release of right of way granted by a deed, which provided access to the public road, the owner could not then claim a way by necessity, as such arises from the presumed intention of the parties, rather than any public policy against landlocked parcels); *Orpin* v. *Morrison*, 230 Mass. 529, 533 (1918) (right of way by necessity implied by law to be the parties' intent when the granted premises were otherwise inaccessible).

As may be seen, the word "implied" is often used in the cases to describe easements by necessity. Indeed, the confusion here as to whether Cerasuolo's easement over parcel B should be characterized as an easement by necessity or an easement by implication appears to arise from the judge's interpretation of the following, oft-cited language:

> "It 'is familiar law that if one conveys a part of his land in such form as to deprive himself of access to the remainder of it unless he goes across the land sold, he has a way of necessity over the granted portion. This comes by implication from the situation of the parties and from the terms of the grant when applied to the subject matter.' "

*Davis* v. *Sikes*, 254 Mass. 540, 545 (1926), quoting from *New York & New England R.R.* v. *Railroad Commrs.*, 162 Mass. 81, 83 (1894).

From the above, the Land Court judge placed her emphasis on the phrase "by implication," concluding that the defendants' right to cross over parcel B was an easement by implication. While both types of easement might appropriately be described

as implied — that is, implied rather than arising from an express grant — an easement by implication is a term more commonly applied to an implied grant derived from an established pattern of prior use rather than from the necessity to access a newly landlocked parcel. "Where during the common ownership of a parcel of land an apparent and obvious use of one part of the parcel is made for the benefit of another part and such use is being actually made up to the time of severance and is reasonably necessary for the enjoyment of the other part of the parcel, then upon severance of the ownership a grant to continue such use may arise by implication." *Sorel* v. *Boisjolie*, 330 Mass. 513, 516 (1953). See *Cummings* v. *Franco*, 335 Mass. 639, 642 (1957) (water pipes and electrical connections running through or attached to the front house on a lot to supply a house in the rear of the lot gave rise to a grant of easements by implication upon the severance of common ownership).[6] But as the trial judge correctly observed, both types of easement arise from what we gather, from the circumstances, to be the parties' intent when common ownership is severed. See, e.g., *Dale* v. *Bedal*, 305 Mass. 102, 103-104 (1940).

Based on the judge's findings here regarding the circumstances of the 1873 severance of Wood's property, we agree with the town that the private crossing over parcel B is more typical of what the cases describe as an easement by necessity. The need to establish a way to access Wood's southern parcel

[6]Generally, the focus of the cases finding an easement by implication is on a particular prior use of one parcel by the now separately-owned parcel, the continuation of which is implied as being what the parties intended. "Such interests have been recognized when land was formerly in common ownership, when use of one part of the land was made for the benefit of another part up until the time of the severance of ownership, and when the use of one part is both reasonably ascertainable and reasonably necessary for the enjoyment of the other part." *Flax* v. *Smith*, 20 Mass. App. Ct. 149, 152 (1985). See, e.g., *Mt. Holyoke Realty Corp.* v. *Holyoke Realty Corp.*, 284 Mass. 100, 104-105, 107-108 (1933) (easement by implication for a stairway access between buildings, which was used openly, obviously, and continuously at and preceding the severance of common ownership); *Sorel* v. *Boisjolie*, 330 Mass. at 516 (easement by implication over the driveway of one parcel, which had been continuously and openly used for many years prior to a conveyance to access a barn on another parcel); *Perodeau* v. *O'Connor*, 336 Mass. 472, 475 (1957) (easement implied where a right of way over a common driveway was open and obvious at the time of the severance of lots previously held in common ownership).

arose only upon his conveyance of parcel B, and it is from his need to reach the newly landlocked parcel, rather than from any prior course of use, that the parties' intent to create the easement was presumed. Despite our conclusion, the distinction, for purposes of this case, does not resolve the parties' principal dispute, that is, whether the private crossing may now be utilized for vehicular access to 258 apartment units.

2. *The 1930 instruments.* The reason for the town's insistence that the private crossing is available only as an easement by necessity becomes apparent when we turn to the 1930 railroad deed, the Monsen release, and the 1929 plan. The town argues that as a result of these 1930 instruments, either the necessity giving rise to the easement at the private crossing was eliminated or the easement rights were at least narrowed, such that the private crossing is not available for the defendants' proposed use.

As to the first point, we reject the notion, as did the judge, that the 1930 instruments, by expressly acknowledging the existence of the easement at the private crossing, precluded its being considered any longer as an easement by necessity. The town points to no authority for the proposition that, merely by showing the location of the private crossing easement on the 1929 plan, the parties eliminated the easement by necessity and replaced it with an express easement with limited rights.[7]

Along somewhat related lines, the town also argues that once the location of the easement at the private crossing was identified and fixed by the parties' express agreement, per the 1930 instruments, the easement could not thereafter be changed, except by agreement. See, e.g., *Davis* v. *Sikes*, 254 Mass. at 546-547.[8] From that premise, the town maintains that the parties' 1930 agreement fixed not only the location of the private

---

[7]The town presses this point apparently to assert that because the easement by necessity was eliminated by subsequent agreements fixing the location and width of the crossing, the defendants are now limited to the uses available for a seven-foot wide way, rather than uses permitted under the reasonable use standard associated with such easements at common law. See, e.g., *Davis* v. *Sikes*, 254 Mass. at 547. As such, the argument goes to the scope of the easement rather than its existence. (See our discussion at part 3, *infra*.)

[8]The recent Supreme Judicial Court decision, *M.P.M. Builders, LLC* v. *Dwyer*, 442 Mass. 87 (2004), establishing that the owner of the servient estate

crossing, but also its boundaries. Thus, according to the town, once Cerasuolo conveyed access to crossing B to a third party in 1945, all that remained for the defendants' use was the seven-foot wide private crossing shown on the 1929 plan.

We think the effect of the 1930 instruments on the private crossing easement rights was a question of fact for the trial judge. "The law is settled that if the bounds of a way are not located by the deed which creates it, the parties may fix the location upon the servient premises . . . ." *Mahoney* v. *Wilson*, 260 Mass. 412, 414 (1927). Where the evidence is conflicting, it is a question of fact for the judge to decide what location was intended. *Ibid.* Moreover, where a deed does not expressly fix or define the width of the right of way, it is also a question fact whether the parties agreed to, or thereafter acquiesced in, a particular width. *George* v. *Cox*, 114 Mass. 382, 387-388 (1874). Thus, while the 1930 railroad deed, on its face, fixed the specific location, the question whether the 1930 railroad deed, the Monsen release, and the 1929 plan, taken together, also fixed the width of the private crossing easement was one of fact for the judge.

The judge found from the evidence that crossing B was granted in order to identify a new crossing location, in exchange for the release of the Monsens' easement rights at two former crossings, A and C. The judge also found that the 1930 instruments, taken together, preserved the Monsens' easement rights at the private crossing. But the judge found that the 1930 instruments did not constitute an express agreement or limitation as to the width and use of the private crossing.

The judge's interpretation of the 1930 instruments finds ample support in the documents themselves and the surrounding circumstances. The judge observed that the railroad deed, while expressly fixing the location and the width of the new crossing B, did not mention the private crossing, and that the Monsen release was the only record instrument that refers to the private

---

may in certain situations relocate an easement without the easement holder's consent, does not affect the town's reasoning here. In its opinion, the court reiterated that the dominant estate owner still could not unilaterally relocate an easement. *Id.* at 90 n.4, citing *Kesseler* v. *Bowditch*, 223 Mass. 265, 269-270 (1916).

crossing, by exempting it from the release and by stating only that crossing B and the private crossing are "shown on the plan."

The town urges that the private crossing's width, as depicted on the 1929 plan, is capable of calculation by using the general scale there indicated, of "1 inch equals 100 feet." But the judge rejected the inference. Rather, she found that, "[b]ased on the instruments, viewed in conjunction with the Plan, it would appear that it was the intention of the parties to use the Plan for purposes of indicating the *locations* of the ways referred to in the documents that were to be released, granted, and excepted by the 1930 Agreement" (emphasis in original).

Based on the foregoing, the judge reasonably concluded that Cerasuolo's right to use the private crossing was not fixed or limited in width by what was shown on the plan attached to the 1930 instruments.[9] Upon conveyance of the property adjacent to crossing B to a third party, the judge found that the easement rights at the private crossing remained, the Monsens having expressly reserved their rights in that location. Because the trial judge determined that the parties had not agreed to a particular width of the easement rights at the private crossing, it is presumed that the easement was for "a way of convenient width for all the ordinary uses of free passage to and from [the landlocked] land." *George* v. *Cox*, 114 Mass. at 388.

3. *Scope and extent of use.* We turn, finally, to the question whether the defendants may use the private crossing easement to provide access to the proposed apartment complex. The judge, finding no express grant or limitations respecting the private crossing, concluded that "the scope of the easement would include the use requested by the [d]efendants, as access to the approximately forty acre [s]outhern [p]arcel."

The principles governing the use of an easement by necessity are the same as those applied to easements obtained by grant.

---

[9]Based upon this conclusion, the judge properly rejected the town's contention that art. 97 of the Amendments to the Massachusetts Constitution applied to the defendants' proposal to expand the use of the private crossing easement. As the easement was not granted by the town, and because the defendants' proposed use, if deemed reasonable (see our discussion in part 3, *infra*), would not constitute a change of legal or physical control, the town has not demonstrated that the controversy here falls within the purview of art. 97.

*Davis* v. *Sikes*, 254 Mass. at 547. And, since "[a] general right of way obtained by grant may be used for such purposes as are reasonably necessary to the full enjoyment of the premises," the same holds true for an easement by necessity. *Ibid.* See *United States* v. *176.10 Acres of Land*, 558 F. Supp. 1379, 1381 (D. Mass. 1983). "Where the easement arises by grant and not by prescription, and is not limited in its scope by the terms of the grant, it is available for the reasonable uses to which the dominant estate may be devoted." *Parsons* v. *New York, N.H. & H.R.R.*, 216 Mass. 269, 273 (1913) (rejecting the defendant's contention that the way was confined to farming uses, the original purpose for which the easement was intended).[10] "It does not follow, however, that because the defendant has a general right of way over the 'Lane' he may exercise it in any manner he sees fit." *Hodgkins* v. *Bianchini*, 323 Mass. 169, 173 (1948), citing *Parsons* v. *New York, N.H. & H.R.R.*, *supra.* "The extent of travel and the size of the vehicles employed are not without limits." *Hodgkins* v. *Bianchini*, *supra.*

The town correctly points out that even if the private crossing is not limited to the seven-foot width depicted on the 1929 plan, its use must be consistent with what the parties reasonably anticipated at the time of the establishment of the way. See *Randall* v. *Grant*, 210 Mass. 302, 304 (1911) ("due consideration being given to the obvious purposes which the parties had in view in establishing the way"). See also *United States* v. *176.10 Acres of Land*, *supra.* In making that determination, "[i]t is to be assumed that they anticipated such uses as might reasonably be required ·by a normal development of the dominant tenement." *Ibid.*, quoting from Restatement of Property § 484 comment b (1944).

Based on that standard, the town argues that the developer's proposed use of the private crossing far exceeds the normal

---

[10]We note that *Glenn* v. *Poole*, 12 Mass. App. Ct. 292, 292-293 (1981), which involved the use of an easement acquired by prescription, has limited applicability here, and so we reject the town's reliance on the more stringent standard applied to the right of way in that case. The same holds true for *Swensen* v. *Marino*, 306 Mass. 582, 586 (1940), in which the origin of the right of way was unknown, and so the court treated the right narrowly, as if obtained by prescription.

development that might have been anticipated for the affected properties, whether measured from the time of Wood's original conveyance of parcel B to the railroad or from the time of the fixing of the private crossing's location in 1930.[11] The town contends that the proposed use will overburden the easement, by expanding the width to twenty-four feet and by generating an estimated 1,680 vehicle crossings per day, compared to the ten to twelve vehicular crossings per day allegedly made by John Cerasuolo when he actively utilized the property for agriculture.

The defendants concede that reasonableness must be viewed in the context of what constitutes normal development of the dominant estate, here the southern parcel. But the defendants contend that the transition from agricultural use, for which the property was actively utilized at the time of the relevant conveyances, to the proposed residential use, is a foreseeable development that the original property owners would have contemplated. See, e.g., *United States* v. *176.10 Acres of Land*, 558 F. Supp. at 1381 (transition from agricultural to residential use constituted a foreseeable, normal development). They cite evidence in the record tending to show that at the time of the 1873 Wood conveyance of parcel B to the railroad, farming activity on the northern and southern parcels was extensive. They also point to testimony that, even in the years after the 1930 instruments were executed, John Cerasuolo made active use of the northern and southern parcels for farming, and regularly used the private crossing easement for truck and tractor access, at a width in excess of thirty feet. Thus the defendants attempt to demonstrate that, although the property has been used only sporadically of late, the private crossing easement was used more heavily, and at a significantly wider dimension, in the past. Hence, they argue that their plan to develop the property for relatively intensive residential use was foreseeable, and is therefore reasonable, in light of the property's history.

[11]To the extent the town suggests that the point of comparison, for purposes of measuring the abruptness of the proposed development here, should begin with the southern parcel's current state (as unused woodland), that view is not supported by the cases.

On appeal, the parties do a commendable job of highlighting various aspects of the trial record that support their respective views of what constitutes reasonable use and normal development for the affected parcels. What we lack, however, is the benefit of the trial judge's reasoning on this score.

"The findings by the judge must contain 'as many of the subsidiary facts as are necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue.' " *Rapp* v. *Barry*, 398 Mass. 1004, 1004 (1986), quoting from *Denofre* v. *Transportation Ins. Rating Bureau*, 532 F.2d 43, 45 (7th Cir. 1976). Here, the judge found that the parcels on either side of the private crossing were used for agriculture until the mid-1950's, at which time agricultural use ceased. She also acknowledged that the defendants proposed to use the private crossing easement to provide access for "a multi-family residential development consisting of ten buildings housing 258 apartment units of in excess of 1,000 square feet each, 534 parking spaces, and site amenities." She then concluded, with no further explanation, that the scope of the easement at the private crossing would include this proposed use, consistent with the standard of an easement's availability for "every reasonable use to which the dominant estate may be devoted." *Labounty* v. *Vickers*, 352 Mass. 337, 345 (1967), quoting from *Rajewski* v. *MacBean*, 273 Mass. 1, 6 (1930).

Whether the defendants' use of the private crossing easement to access the proposed housing development is reasonable, in light of what might be considered the normal development of the southern parcel, is largely a question of fact. See *Labounty* v. *Vickers, supra.* But we cannot tell from the judge's decision what subsidiary findings supported the conclusion that the proposed ten-building apartment complex constituted normal development of a parcel formerly used for agriculture, such that the concomitant increase in the scope of the private crossing is deemed a reasonable requirement in accommodating such use. See, e.g., *Davis* v. *Sikes*, 254 Mass. at 547; *United States* v. *176.10 Acres of Land*, 558 F. Supp. at 1381. We therefore vacate

the judgment and remand the matter so that the judge may explain the reasoning for her decision with additional findings, in accordance with the principles we have set forth in this opinion.

*So ordered.*