MARIA A. KITRAS, trustee,[1] & others[2] *vs.* TOWN OF AQUINNAH & others.[3]

No. 04-P-472.

Suffolk. April 11, 2005. - August 18, 2005.

Present: GRASSO, BROWN, & TRAINOR, JJ.

*Easement. Real Property*, Easement. *Wampanoag Tribal Council. Governmental Immunity.*

In an action brought by owners of landlocked lots seeking easements by necessity crossing certain land belonging to a Native American tribe (tribal land), the judge erred in dismissing the action for failure to join an indispensable party, based on the conclusion that the claims could not be fairly adjudicated in the absence of the trustee of the tribal land, the United States (which had been dismissed from the litigation on the ground of sovereign immunity), where although easements by necessity could be implied for those landlocked lots that had unity of title [290-294], such easements would not necessarily traverse or otherwise burden the tribal

---

[1]Of Bear Realty Trust, Bear II Realty Trust, and Gorda Realty Trust.

[2]James J. Decoulos, as trustee of Bear II Realty Trust and Gorda Realty Trust; Victoria Brown; Gardner Brown, Jr.; Mark D. Harding; and Eleanor P. Harding, as trustee of the Eleanor P. Harding Trust.

[3]Vineyard Conservation Society, Inc.; Benjamin L. Hall, Jr., as trustee of Gossamer Wing Realty Trust; David Wice; Betsy Wice; Susan Smith; Russell Smith; John F. Kennedy, Jr.; Caroline Kennedy; George B. Brush, as trustee of Toad Rock Realty Trust; South Shore Beach, Inc.; Leonard F. Vanderhoop, Jr.; Joanne Fruchtman; Jack Fruchtman; Peter Ochs; Hope E. Horgan; Helen S. James; Donald Taylor; Moshup Trail II Limited Partnership; Richard Hoyle; Charles E. Derby; Shirley A. Jardin; heirs of Wallace E. Francis; Jeffrey Madison, as trustee of Tacknash Realty Trust; estate of Edwin D. Vanderhoop; John A. Wiener; Sally D. Wiener; Patrick J. Evans; Scott Harrison; Julie B. Hoyle; Carmella Stephens, as trustee of Deer Meadow Realty Trust; Stella Winifred Hopkins, also known as Winifred S. Hopkins; heirs of Esther Howwasswee; heirs of Savannah F. Cooper; Heidi B. Stutz; Michael W. Stutz; Hamilton Camman; Mary Elizabeth Pratt; heirs of Amos Smalley; June Noble; Richard Sullivan; Sarah Saltonstall; Steven Yaffe; Thomas Seeman; Lawrence B. Evans; Beverly A. Evans; estate of William Vanderhoop; Kevin Craig; Cynthia Craig; Flavia Stutz; Robert Stutz; Selma Greenberg; William Greenberg; Wilma Greenberg; Alexandra Whitcomb; Rolph Lumley; and Aurilla Fabio.

lands [294-296], and to the extent that any easements would be located on or routed through the tribal lands, such claims could be fairly adjudicated by joining the tribe directly, as permitted under 25 U.S.C. § 1771e(c)(3)(B) [296-298].

CIVIL ACTION commenced in the Land Court Department on May 20, 1997.

Motions to dismiss were heard by *Mark V. Green,* J.; motions to amend the complaint were heard by *Leon J. Lombardi,* J., and entry of judgment was ordered by him.

*H. Theodore Cohen* (*Leslie-Ann Morse* with him) for the plaintiffs.

*Jennifer S.D. Roberts* for Vineyard Conservation Society, Inc.

*Ronald H. Rappaport* for town of Aquinnah.

*Benjamin L. Hall, Jr.,* pro se.

BROWN, J. Before us are the owners of certain landlocked lots lying within the town of Aquinnah (town) on Martha's Vineyard. Desirous of developing their lots but having no road frontage or access to utilities, these owners claim easements by necessity crossing their neighbors' lots. One of those neighbors is the United States, which holds a number of town lots in trust for the Wampanoag Tribal Council of Gay Head, Inc. (Tribe), a Federally recognized Native American Tribe. On cross motions for dismissal or summary judgment, a Land Court judge concluded that any easements by necessity would burden tribal land; that the claims could not fairly be adjudicated in the absence of that land's trustee, the United States (which had been dismissed from the litigation on sovereign immunity grounds); and that the owners' claims therefore must be dismissed for want of an indispensable party. A different judge denied subsequent attempts to join the Tribe directly and, pursuant to Mass.R.Civ.P. 54(b), 365 Mass. 820 (1974), entered a partial judgment from which these appeals and cross appeals mainly have been taken. We reverse and remand.

I

The area of Martha's Vineyard originally known as Gay Head, now the town of Aquinnah, was "and is still the home of a

remnant of that race, which . . . the white man found here as lords of the soil." Report of the Commissioners, 1856 House Doc. No. 48, at 3. On May 6, 1687, "Joseph Mittark, sachem of Gay Head," an Algonquian and chief's son, purportedly deeded Gay Head to New York Governor Thomas Dongan. *Id.* at 6. Dongan, in turn, on May 10, 1711, transferred his fee to an English religious entity. *Id.* at 4. This entity neglected Gay Head, neither "demand[ing] rents" nor "exercis[ing] over it any jurisdiction or control." *Id.* at 5. Although it is not entirely clear how, or under what authority, sometime after the Revolutionary War the Commonwealth assumed control of Gay Head and its residents became wards of the State.

So matters stood until mid-Nineteenth Century when, apparently as part of the move to grant full citizenship to the Commonwealth's Native American residents, commissioners appointed by the Governor recommended that a boundary marked by a stone fence be established "between the lands of [the Gay Head Indians] and the lands of the white inhabitants of Chilmark." *Id.* at 2. Later, by St. 1862, c. 184, §§ 4 and 5, the Legislature established the district of Gay Head and directed the clerk of the district to make and maintain "a register of the lands of [the district], as at present held, whether in common or severalty, and if in severalty, by whom held." Charles Marston then was appointed as a commissioner to

> "examine, and fully and finally to determine, all boundary lines between the individual owners of land located in the Indian district of Gay Head . . . and also to determine the boundary line between the common lands of said district and the individual owners adjoining said common lands."

Resolves 1863, c. 42. Marston died soon thereafter; Richard Pease was appointed in his stead. Resolves 1866, c. 67.

In its 1870 report to the Senate, a legislative committee noted that Gay Head "contains, within its area, about two thousand four hundred acres of land. About four hundred and fifty acres of the land is held in severalty, and is fenced and occupied by the several owners, and the remainder is held by the tribe in common." Report of the Committee, 1869 Senate Doc. No. 14, at 4. The committee observed that this common land was

"uneven, rough, and not remarkably fertile. . . . [I]t is, perhaps, better that these lands should continue to lie in common for the benefit of the whole community as pasturage and berry lands, than to be divided up into small lots to lie untilled and comparatively unused." *Id.* at 5.

Situated on a peninsula and separated from the main island by an isthmus, Gay Head at that time was served by a single main road "much travelled in summer by people from the main land, pleasure-seeking on the Vineyard"; this road nonetheless was described as being "in most deplorable condition of which your Committee had most 'striking' proof," and as blocked by "a substantial stone wall" and "bars" that "have to be removed whenever a carriage crosses." *Id.* at 9. The committee thus recommended "that provision be made at an early day whereby the road in Gay Head from the light-house to Chilmark shall be put in good travelling order at the expense of the State." *Id.* at 10.

After receiving the committee's 1870 report, the Legislature abolished the district of Gay Head, in its place incorporating the town of Gay Head (later renamed the town of Aquinnah), St. 1870, c. 213, § 1. The act also required the Dukes County "judge of probate . . . , [upon proper application for division of] any or all of the common lands of [the town], [to] appoint two discreet, disinterested persons commissioners to make partition of the same," and charged the judge to "direct the said commissioners to examine and define the boundaries of the lands rightfully held by individual owners, and to properly describe and set forth the same in writing, and the title and boundaries thus set forth and described, being approved by the court, shall be final in the premises." St. 1870, c. 213, § 6. The act also directed the county commissioners of Dukes County to lay out and construct a road — what is now called State Road — from Chilmark to the Gay Head lighthouse. St. 1870, c. 213, § 5. See the Appendix to this opinion for a sketch plan depicting the roads and lots at issue.

With the command of St. 1870, c. 213, commissioners Joseph Pease and Richard Pease proceeded to identify and fix the lots. At that time, as noted, the land was already held either in severalty or in common. By reports of 1871 and 1878, the Pease

brothers formalized the boundaries of those lots already held in severalty, numbering them 1 through 188 or 189. With the exception of certain land not relevant here, the common land was partitioned in 1878 into lots numbered 189 or 190 and above.[4] The vast majority of the lots so set off have no frontage on or other access to what became State Road. None of the reports or original deeds makes mention of easements, either to State Road or to any other location.

The years since have seen changes, most notably with respect to the perceived value of the town's "uneven, rough, and not remarkably fertile" land. Also relevant here, by at least 1939 an unpaved way now known as Zack's Cliffs Road, leading generally south from State Road (via Old South Road) to and across certain of the lots here at issue, appears to have been in regular use. Nothing in this record establishes that Zack's Cliffs Road was in use significantly before that date. In 1954 a new road, called the Moshup Trail, was laid out and, over the next several years, constructed; this paved road travels generally south and west from State Road through the area generally under consideration here (although none of the persons here claiming easements own lots with road frontage).

Perhaps most important, as part of a comprehensive settlement resolving "Indian claims to certain lands within the town," St. 1985, c. 277, § 1, the Tribe acquired in the mid- to late 1980's several hundred acres of town land (the Settlement Lands); the Settlement Lands are held by a State-chartered corporation, called the Tribal Land Corporation, with the United States acting as trustee. See *Building Inspector & Zoning Officer of Aquinnah* v. *Wampanoag Aquinnah Shellfish Hatchery Corp.*, 443 Mass. 1, 3, 8 (2004). The Settlement Lands consist of several physically unconnected parcels in and about the town; for our purposes, we focus on the central parcels, consisting of numerous lots generally lying between State Road and the lots here at issue.

Before identifying the lots and interests most directly relevant here, we pause to note that it sometimes is difficult to determine from the pleadings what owners are claiming what easements

---

[4]The lot numbered 189 is an anomaly, described in the record as held prior to these events both in severalty and in common.

for what lots, or even what parties remain interested in the case. In the interest of expediency and because our decision today does not depend upon it, we proceed as if all persons and lots noted below properly are before us and under consideration. On remand it will be for the trial judge and parties to resolve these uncertainties.

That said, as described by the motion judge in his decision, and as presented in the summary judgment materials and the appellate briefs, plaintiffs Maria Kitras (as trustee of Bear Realty Trust, Bear II Realty Trust, and Gorda Realty Trust) and James Decoulos (as trustee of Bear II Realty Trust and Gorda Realty Trust) (collectively, Kitras) claim ownership of five lots, numbered 178, 711, 713, 232 and 243. Plaintiffs Gardner and Victoria Brown (collectively, Brown) own lot 238. Plaintiffs Eleanor Harding (as trustee of the Eleanor P. Harding Trust) and Mark Harding own two lots, numbered 554 and 555. Defendant Benjamin Hall (as trustee of either Gossamer Wing Realty Trust or Baron Land Realty Trust) (Hall) here claims ownership of lots 707, 710, 302, 177 and 242 (the latter two lots are labeled Howwasswee in the Appendix). The remaining defendants own various other lots in the general vicinity of the plaintiffs' and Hall's lots.

## II

Rule 19(a) of the Massachusetts Rules of Civil Procedure generally provides that the category of "[p]ersons to be [j]oined if [f]easible" includes one whose absence would prevent complete relief from being afforded those already parties. Mass. R.Civ.P. 19(a), 365 Mass. 765 (1974). If it is not feasible to join such a person, "the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." Mass.R.Civ.P. 19(b), 365 Mass. 765 (1974). See G. L. c. 231A, § 8.

A person with an interest in land ordinarily should be joined if a judgment could affect that interest. See *Uliasz* v. *Gillette*, 357 Mass. 96, 105 (1970). Persons in possession of land burdened by an easement have an interest in land such that they ordinarily should be joined in actions that concern that

easement. See *Vance* v. *Ford*, 187 Or. App. 412, 423-425 (2003). No party suggests that the United States has waived its sovereign immunity such that it may be joined in this action. See *Alaska* v. *Babbit*, 38 F.3d 1068, 1072-1074 (9th Cir. 1994). The question presented by the judgment before us, then, is whether the United States, as trustee over the Settlement Lands, was an indispensable party in an action seeking a declaration that certain lots in the general vicinity of the Settlement Lands had the benefit of easements by necessity. See and compare *Bay Colony Constr. Co.* v. *Norwell*, 5 Mass. App. Ct. 801 (1977). Of course, we need not reach that question unless easements by necessity may be implied for some or all of the lots in question.

A. "An easement is by definition a limited, nonpossessory interest in realty." *M.P.M. Builders, LLC* v. *Dwyer*, 442 Mass. 87, 92 (2004). It may be created either expressly, see, e.g., *id.* at 88, or, in some limited cases, implicitly from circumstance; an easement by necessity is of the latter sort. In general, such an easement is "said to arise (or be implied) . . . when a common grantor carves out what would otherwise be a landlocked parcel." *Bedford* v. *Cerasuolo*, 62 Mass. App. Ct. 73, 76-77 (2004), quoting from *New England Continental Media, Inc.* v. *Milton*, 32 Mass. App. Ct. 374, 378 (1992). More specifically, an easement by necessity may be implied if we can fairly conclude that the grantor and grantee, had they considered the matter, would have wanted to create one. To make this deduction, we require (1) that both dominant and servient estates once were owned by the same person or persons, i.e., that there existed a unity of title; (2) a severance of that unity by conveyance; and (3) necessity arising from that severance, all considered "with reference to all the facts within the knowledge of the parties respecting the subject of the grant, to the end that their assumed design may be carried into effect." *Orpin* v. *Morrison*, 230 Mass. 529, 533 (1918). See *Nichols* v. *Luce*, 24 Pick. 102, 104 (1834); *Davis* v. *Sikes*, 254 Mass. 540, 545-546 (1926); *Joyce* v. *Devaney*, 322 Mass. 544, 549 (1948); *Nylander* v. *Potter*, 423 Mass. 158, 162 (1996); Restatement (Third) of Property (Servitudes) § 2.15 (2000).

Of critical importance for the present analysis is the unity of title requirement, which derives from the simple observation

that, whatever the intent, one may not grant what one does not own. See *Boudreau* v. *Coleman*, 29 Mass. App. Ct. 621, 632 (1990). Thus, easements can be created only "out of other land of the grantor, or reserved to the grantor out of the land granted; never out of the land of a stranger." *Richards* v. *Attleborough Branch R.R. Co.*, 153 Mass. 120, 122 (1891). See *Uliasz* v. *Gillette*, 357 Mass. at 102. Here, with respect to the lots numbered 1 through 188 or 189, the Commonwealth, whom the parties assume to be the grantor,[5] could not grant or reserve an easement because, at the times at interest here, it did not own the lots: each of those lots already was owned by other persons. There was thus no unity of title and no easements can be implied.

As Hall observes, this "was *not* just a routine subdivision development invoking the application of traditional easement principles" (emphasis original). It will be recalled that the commissioners' process did not operate on virgin, untenanted land. Instead, what eventually became the town was tenanted at the times under discussion by individuals, many of whom claimed ownership of discrete and separated portions of that land. These claims developed out of what the commissioners understood to be the prevailing tribal law or tradition, with the "rule [being] that any native could, at any time, appropriate to his own use such portion of the unimproved common land, as he wished, and, as soon as he enclosed it, with a fence, of however frail structure, it belonged to him and his heirs forever." Report of the Commissioners, 1849 House Doc. No. 46, at 20. As another commissioner noted, "the title to land, so taken up and enclosed,

---

[5]We do not doubt that the Commonwealth, a governmental entity, can act as a grantor for these purposes, though this is a question of some controversy not previously decided in this Commonwealth. See Bruce & Ely, Easements & Licenses in Land § 4:7, at 4-18 to 4-20 (2001) (collecting authorities). "The rationale for [rejecting governmental ownership of both lots as satisfying the unity-of-title standard] is unclear, but one commentator suggests that it may be based on 'some remnant of the prerogative of the sovereign.' " *Id.* at 4-18 to 4-19 (footnotes omitted), quoting from Simonton, Ways by Necessity, 25 Colum. L. Rev. 571, 579 (1925). The Restatement has, without discussion, taken the position that easements "by necessity arise on conveyances by governmental bodies as well as by other grantors." Restatement (Third) of Property (Servitudes) § 2.15 comment c (2000). There appears no compelling modern reason here to distinguish between governmental and private grantors, and we adopt the Restatement's approach.

is never called in question" under "the unwritten Indian traditional law." Report to the Governor and Council Concerning the Indians of the Commonwealth, 1862 House Doc. No. 215, at 34.

The commissioners appointed with the task of "examin[ing] and defin[ing]" those who already claimed partitions respected this unwritten Indian traditional law, and a legislative committee described the land so claimed as being in "severalty." Report of the Committee, 1869 Senate Doc. No. 14, at 4. Indeed, far from "partitioning" or "severing" the land so held, the commissioners acted, under charge from the Legislature, simply to acknowledge "the boundaries of the lands *rightfully held by individual owners*" (emphasis added). St. 1870, c. 213, § 6. Nor can it be said that the Commonwealth had in those already claimed lots a right of present possession or some other title carrying with it the right to grant presently operative easements; instead, at most, the Commonwealth held a "fee title" on those lots, meaning it had only "a contingent future interest which ripened into a fee simple only when the Indians abandoned their possessory interest [Indian title] (or when the sovereign, holding fee title, took that possessory interest)." *James* v. *Watt*, 716 F.2d 71, 74-75 (1st Cir. 1983), cert. denied, 467 U.S. 1209 (1984) (quotation marks, citation and emphasis omitted).

Thus, considered most favorably from the complainants' perspective, the titles for each of the lots numbered 1 through 188 or 189 can best be described as an unusual mixture of the aboriginal or beneficial title and corresponding unlimited right of possession held by an individual, on the one hand, and the Commonwealth's contingent future interest represented by its fee, on the other. But however title is described, each lot was owned by a different individual, and the unity of title required to imply an easement by necessity fails. See *Richards* v. *Attleborough Branch R.R. Co.*, 153 Mass. at 122; *Uliasz* v. *Gillette*, 357 Mass. at 102.

Lots 189 or 190 and above, however, are on a very different footing; those lots consisted before division of a single tract of unclaimed and untenanted common land. Though owned in equal measure by numerous persons, each partitioned lot thereby

had, before severance, common owners, and the unity of title requirement is satisfied for those commonly owned lots. We also note that the plaintiffs' and Hall's remaining lots — those numbered 189 or 190 and above — were landlocked as a result of that partition. Accordingly, like the motion judge, we assume that easements by necessity could be implied for those lots.

B. But we part company with the motion judge as to his conclusion that such easements, if implied, must inevitably traverse or otherwise burden the Settlement Lands.[6] To be sure, for most of the affected lots — with the exception of Hall's lot 302 — a more or less direct route north through what are now the Settlement Lands would have been at the time of partition the most logical routing choice to access what at some point became State Road. However, we have certain reservations about whether Zack's Cliffs Road could serve as a routing choice for all of the lots, insofar as only three of the lots at issue — Kitras lots 243 and 178, and Hall lot 242 — touch upon Zack's Cliffs Road. The remaining lots — Kitras lots 232, 711, and 713; Hall lots 302, 707, and 710; and the Brown and Harding lots — have no direct access to Zack's Cliffs Road. See Appendix. Still, in principle, we grant the general logic of the motion judge's observation.

But that a thing is probable is not to say it is necessary or inevitable where circumstances revealed in the record suggest different possible results. See *Bedford* v. *Cerasuolo*, 62 Mass. App. Ct. at 80 (location and precise bounds of easement, when not specified in deed, presented question of fact). On the record before us it requires no great stretch to imagine any number of routes from the various lots to State Road. Many traverse the Settlement Lands; many do not. For example, while we do not presume to specify any particular location, we observe that a public way, the Moshup Trail, opened in the general vicinity of the plaintiffs' and Hall's lots in the early 1960's. Many of the lots at issue are separated from this way, which leads to State Road, by only an intervening lot or two. Locating easements to

---

[6]The motion judge explicitly ruled that the "record does not indicate the existence of any way in use on the ground at the time of the commissioners' [the Peases'] 1878 report, and the present record is insufficient to establish conclusively the location of a way by necessity."

this road, therefore, would (i) not affect the Settlement Lands; (ii) minimize the total number of lots burdened; (iii) advantageously exploit the assumed Zack's Cliffs Road routing, which intersects the Moshup Trail running south; (iv) for the most part avoid lots 1 through 188 or 189; and (v) give expression to what we assume was the town's intent in allowing the Moshup Trail to be constructed in the first instance (that it be used by local residents to gain access to State Road).

For present purposes we are not troubled that the Moshup Trail did not exist when the common lots were partitioned. The same objection, after all, applies to an easement routed to or over Zack's Cliffs Road, yet no party suggests that this road would be an inappropriate easement location. In any case, we focus here on route and location, not creation (about which we will have additional comments later). At this procedural stage, and given our stated assumptions, we have no difficulty envisioning a multiplicity of intentions implied from the circumstances prevailing at the time of partition, *Orpin* v. *Morrison*, 230 Mass. at 533, including that the lots were to have access to whatever road was most convenient or might be constructed at some future date. It will be recalled in this regard that State Road in the 1870's was described as being in "deplorable condition" and blocked to free traffic by barriers at the isthmus. Compare *Crotty* v. *New River & Pocahontas Consol. Coal Co.*, 72 W. Va. 68, 71 (1913) (upon severance of common parcel, "parties may well be presumed to have contemplated such conditions as the future was likely to bring forth").

In so considering we also remain mindful of the nature of the easement claimed. Whereas a preexisting use might in some cases give rise to an implied easement, see *Bedford* v. *Cerasuolo*, 62 Mass. App. Ct. at 78, we imply an easement by necessity not from use but from a "severance of rights [once] held in a unity of ownership." Restatement (Third) of Property (Servitudes) § 2.15 comment c (2000). In this sense an easement by necessity, initially having no determined physical location, may be located as circumstances or the parties later dictate. Compare *Bass* v. *Edwards*, 126 Mass. 445, 449 (1879) (way by necessity arising, owner of dominant estate retained "the

right to deviate from the usual way and go over other parts of the land, doing no unnecessary damage," when owner of servient estate blocked usual route); *Crotty* v. *New River & Pocahontas Consol. Coal Co.*, 72 W. Va. at 71 (easement by necessity could be routed to road not in existence at time of partition). Cf. *M.P.M. Builders, LLC* v. *Dwyer*, 442 Mass. at 90-91 (adopting Restatement [Third] of Property [Servitudes] § 4.8[3] [2000]); Restatement (Third) of Property (Servitudes) § 4.8(1) (2000). We see no reason why this flexibility should not, in principle, be applied to establish, in light of the town's changing circumstances, present easement locations. With these differing possibilities thus before us, we are unable to conclude with confidence that any easements implied necessarily burden the Settlement Lands or that the United States inevitably has an interest in whatever judgment may be entered.

C. In any case, should easements by necessity be located on or routed through the Settlement Lands, those claims may be fairly adjudicated by joining the Tribe directly.[7] Because of our remand, the joinder issue is likely to arise again. Accordingly, we discuss this matter here.[8]

Title 25 of the United States Code, § 1771e(c)(3)(B) (2000), specifically reserves to the Tribe, not the United States, the right to transfer "any easement for public or private purposes in accordance with the laws of the Commonwealth of Massachusetts or the ordinances of the" town. Any doubt that this provision permits the Tribe to be joined was dispelled by *Building Inspector & Zoning Officer of Aquinnah* v. *Wampanoag Aquinnah Shellfish Hatchery Corp.*, 443 Mass. 1 (2004) (*Shellfish Hatchery Corp.*), decided after the partial judgment before us entered. In *Shellfish Hatchery Corp.*, after reviewing the Tribe's history and the various land disputes, all of which were resolved by a comprehensive settlement agreement implemented at both the State and Federal level by legislation, *id.* at 3-8, the Supreme Judicial Court "concluded that the Tribe

---

[7]Deciding as we do, we do not reach the question whether the various parties' motions to join were correctly denied.

[8]In doing so we express no opinion as to what effect, if any, the Tribe's settlement agreement, implementing State and Federal legislation, or subsequent conveyances may have had on the continuing status of any claimed easements burdening the Settlement Lands.

waived its sovereign immunity as to land use on the Cook Lands." *Id.* at 16-17. In so concluding, the court found particularly compelling language in the Tribe's settlement agreement specifying that the Tribe agreed to hold its land "in the same manner, and subject to the same laws, as any other Massachusetts corporation."[9] *Id.* at 13.

Although *Shellfish Hatchery Corp.* dealt with the Cook Lands and involved a zoning dispute (rather than the easement rights here at issue) we see little reason to suppose the court's rationale would not control the present proceedings. The central Settlement Lands here at issue are subject to the same settlement agreement and implementing State and Federal legislation as the Cook Lands. Section 3 of the settlement agreement, also cited in *Shellfish Hatchery Corp.*, specifies that the Tribe

> "shall hold the Settlement Lands, and any other land it may acquire [e.g., the Cook Lands], in the same manner, and subject to the same laws, as any other Massachusetts corporation . . . . Under no circumstances . . . shall the civil . . . jurisdiction of the Commonwealth of Massachusetts, or any of its political subdivisions, over the settlement lands, or any land owned by the [Tribe] in the [town], or the Commonwealth of Massachusetts . . . be impaired or otherwise altered . . . ."

We also note that § 13 of that agreement provides that all "Federal, State and Town laws shall apply to the Settlement Lands" subject only to limited exceptions not relevant here, a provision mirrored in both the State and Federal implementing acts. See St. 1985, c. 277, § 5; 25 U.S.C. § 1771g (2000).

In light of *Shellfish Hatchery Corp.*, and given the explicit right to transfer easements, 25 U.S.C. § 1771e(c)(3)(B), in accordance with the Commonwealth's laws and subject to the Commonwealth's jurisdiction, it would be anomalous indeed were we to conclude that the Tribe could not be joined in a suit to resolve easement claims potentially burdening the Settlement Lands. As observed in *Shellfish Hatchery Corp.*, "[a]lthough

---

[9]This language, the court held, "is clear and the words 'in the same manner' convey a special, known, and obvious meaning. These words are used by the United States and by the Commonwealth to waive sovereign immunity." *Shellfish Hatchery Corp.*, 443 Mass. at 13.

the Tribe may not desire the precise result now occurring, the Tribe's agreement had a 'real world objective' and 'practical consequence.' . . . By employing the 'in the same manner . . . as' language in paragraph three of the settlement agreement, the parties ensured, in unequivocal wording, that the Tribe would have no special status in its land holdings different from an ordinary Massachusetts business corporation. That status confers, inter alia, the right to sue and be sued, and thus waives the Tribe's sovereign immunity with respect to its" Settlement Lands. *Shellfish Hatchery Corp.*, 443 Mass. at 15-16 (footnote omitted). The same rationale also eliminates any need to join the United States as trustee. See *id.* at 15 n.14.

In sum, given the possibility that at least some easements by necessity benefiting lots formerly part of the common land properly could be routed on nontribal land, and because any easement claims that do affect the Settlement Lands may be resolved by joining the Tribe directly, we do not think that the United States is an indispensable party within the meaning of rule 19. Compare *Brookline* v. *County Commrs. of the County of Norfolk*, 367 Mass. 345, 349 (1975) (all towns potentially affected by judgment need not have been joined because "they [were] not disputants to the immediate controversy"). As we have concluded that the United States is not an indispensable party within the meaning of rule 19, the present claims were not properly dismissed on that basis.

## III

We have until now assumed, for lots numbered 189 or 190 and above, the intent to create easements. This assumption seemingly arises naturally from the necessity created by dividing the common land; the assumption may ultimately be found to be factually correct, but this is not inevitable. It is well established in this Commonwealth: necessity alone does not an easement create. *Nichols* v. *Luce*, 24 Pick. at 104. *Orpin* v. *Morrison*, 230 Mass. at 533. Neither does there exist a public policy favoring the creation of implied easements when needed to render land either accessible or productive. *Richards* v. *Attleborough Branch R.R. Co.*, 153 Mass. at 122 ("The law does not give a right of way over the land of other persons to every

owner of land who otherwise would have no means of access to it"). *Orpin* v. *Morrison*, 230 Mass. at 533-534, quoting from *Gayetty* v. *Bethune*, 14 Mass. 49, 56 (1817) (if one purchases land knowing "he had no access to the back part of it, but over the land of another, it was his own folly; and he should not burden another with a way over his land, for his convenience"). As previously noted, our charge, then, is not to look simply at the necessity, but to consider all "the circumstances under which [the severance] was executed and all the material conditions known to the parties at the time." *Orpin* v. *Morrison*, 230 Mass. at 533. In doing so, in the unique circumstances of this case, the fact that certain lots were landlocked as a result of partition does not persuade us as being the definitive measure of intent.

Particularly noteworthy in our estimation is the commissioners' silence on this issue, as is the fact that even the most cursory glance at a contemporaneous plot map shows that the vast majority of set-off lots had no frontage or obvious access to or from any public amenity. Also problematic is the difficulty of routing easements from the common lands to public roads (at least those arguably existing at the time) without traversing those lands already held in severalty, that is, lots 1 through 188 or 189. With these problems evident, and in light of the careful and lengthy consideration given the partitioning process, the commissioners' failure explicitly to provide for easements might well be interpreted as a deliberate choice.

The record reveals other circumstances that may render doubtful the parties' presumed intent to reserve easements, for example, the nature and then-perceived poor quality of the land so divided. See *Dale* v. *Bedal*, 305 Mass. 102, 103 (1940) (circumstances to be considered include "the physical condition of the premises"). Without belaboring the point, it seems a legitimate question whether anyone at the time, objectively considered, would have troubled to provide for these "uneven, rough, and not remarkably fertile" unclaimed and untenanted lots a beneficial conveyance by reserving for them easements to a road then in "deplorable condition" and blocked to free travel by a stone wall and bars. The 1869 Legislative committee, at least, expected that these lots would "lie untilled and comparatively unused" following division. Report of the Committee, 1869 Senate Doc. No. 14, at 5.

We consider relevant the historical sources of information on tribal use and common custom applicable to the time. Though by itself hardly conclusive, and assuming the material's admissibility, we see no reason why the common practice, understanding and expectations of those persons receiving title could not shed light on the parties' probable, objectively considered intent. See *Flax* v. *Smith*, 20 Mass. App. Ct. at 153 ("[w]hat is required . . . is not an actual subjective intent on the part of the grantor but a presumed objective intent of the grantor and grantee based upon the circumstances of the conveyance").

We do not mean to suggest by our discussion that an easement by necessity for any given lot carved out of the common land either does or does not exist, but rather that the question requires thoughtful consideration and resolution by a fact finder. This question thus is best left for the trial judge, after the parties have had an opportunity to make whatever showing they wish or are able,[10] remaining mindful that it is the proponents' burden to prove the existence of an implied easement. *Cheever* v. *Graves*, 32 Mass. App. Ct. 601, 607, 609 (1992).

Should the requisite intent be found for some or all of the partitioned common lots, this will not end the inquiry: numerous questions remain, including the merger and extinguishment matters noted by the motion judge. In addition, we note that a "right of way by necessity can only be presumed when the necessity existed at the time of the grant; and it continues only so long as the necessity continues." *Schmidt* v. *Quinn*, 136 Mass. 575, 576-577 (1884). Relatively recently several lots appear to have acquired — or at least the lot owners have claimed — the benefit of express or prescriptive easements. Such easements, to the extent they moderated the original necessity, may thereby have extinguished any easements implied from that necessity. Compare *Viall* v. *Carpenter*, 14 Gray 126, 128 (1859); *Hart* v. *Deering*, 222 Mass. 407, 411 (1916). The recent eminent domain takings may also have extinguished any easements located on the lots so taken. See *Darman* v. *Dunderdale*, 362

---

[10]The trial judge may consider whether to relieve certain of the plaintiffs of their respective stipulations to the effect that they would offer no evidence (the Hardings) or certain described testimony (Kitras) at the trial of this action. We are aware of no similar stipulation by any defendant.

Mass. 633, 641 (1972); *New England Continental Media, Inc.* v. *Milton,* 32 Mass. App. Ct. at 378. We also leave the question of scope of any easements to trial.

## IV

The judgment is reversed, the order of December 22, 2003, is vacated, and the case is remanded to the Land Court for further proceedings consistent with this opinion.

*So ordered.*