NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

12-P-260                                          Appeals Court

    MARIA A. KITRAS, trustee,[1] & others[2]  vs.  TOWN OF AQUINNAH &
                           others.[3]


                        No. 12-P-260.

       Suffolk.     January 18, 2013. - January 14, 2015.

          Present:  Kantrowitz, Berry, & Agnes, JJ.


       Easement.  Necessity.  Real Property, Easement.


       Civil action commenced in the Land Court Department on May
20, 1997.

_____

       [1] Of Bear Realty Trust, Bear II Realty Trust, and Gorda
Realty Trust.

       [2] James J. DeCoulos, as trustee of Bear II Realty Trust and
Gorda Realty Trust; and Mark D. Harding, Sheila H. Besse, and
Charles D. Harding, Jr., as trustees of Eleanor P. Harding
Realty Trust.

       [3] Executive Office of Environmental Affairs; Joanne
Fruchtman; Jack Fruchtman; Benjamin L. Hall, Jr., trustee of
Gossamer Wing Realty Trust; Brian M. Hall, trustee of Baron's
Land Trust; Caroline Kennedy; Edwin Schlossberg; Martha's
Vineyard Land Bank; Barbara Vanderhoop, executrix of the estate
of Leonard F. Vanderhoop, Jr.; Vineyard Conservation Society,
Inc.; David Wice; and Betsy Wice.  Also listed as defendants in
the third amended complaint are "persons unknown or
unascertained being the heirs of Savannah Cooper," and "persons
unknown or unascertained who may have an interest in any land
heretofore or hereinafter mentioned or described."

After review by this court, 64 Mass. App. Ct. 285 (2005), the case was heard by Charles W. Trombly, Jr., J.


Wendy H. Sibbison for Maria A. Kitras & another.
Leslie-Ann Morse for Mark D. Harding & others.
Diane C. Tillotson for Martha's Vineyard Land Bank & others.
John Donnelly, Assistant Attorney General, for the Commonwealth.
Jennifer S.D. Roberts for Vineyard Conservation Society, Inc.


BERRY, J.  From the earliest time, the members of the Wampanoag Tribe of Gay Head (now known as Aquinnah) in Martha's Vineyard (Gay Head Tribe or Tribe), had a custom and practice of common access across the lands that are the subject of this appeal.  For the reasons that follow, we conclude that the ancient origins of that common access -- dating back before the late eighteenth century -- establish the equivalent of a chain of title, with access rights that would not yield landlocked parcels.  The late nineteenth century State statutory conveyance of large tracts of public common land in Aquinnah, including the subject lands, by the Legislature as grantor to the newly enfranchised Gay Head Tribe members as grantees, and the subsequent judicial partitioning of these governmentally conveyed lands did not, we determine, break these preexisting access rights.  More specifically, the subsequent grantees of land tracts in the links of this chain of conveyances from the Gay Head Tribe members to the present plaintiffs were not

divested of these long-held access rights flowing from the longstanding tribal custom and practice so as to leave the plaintiffs' lots landlocked and bereft of easements.

It is so that a plumb line -- with perfectly fit easements in the precise transverse of paths walked by and through the lands by the Gay Head Tribe members, in their custom and practice -- would, in this present time, be most difficult to reconstruct by metes and bounds since property boundaries were not set in that manner in the statutory governmental conveyances and subsequent judicial partition that deeded the lots to the Gay Head Tribe members in severalty. But such precision, following the paths of the Gay Head Tribe's custom and practice, is not required under the legal doctrine of easements by necessity which underlies the Restatement (Third) of Property (Servitudes) (Restatement) § 2.15 (2000) and Massachusetts common law. We remand to the Land Court to draw the necessary easement lines in accord with these legal doctrines -- a practice well within the great skills of that court.

To summarize the reasons for our conclusion that easements by necessity exist, as discussed in more detail below: (1) It is absolutely undisputed that common access right by custom and practices existed among the Gay Head Tribe members over the lands in question. Accordingly, there would not have been any need for restatement of the access rights in the conveyance

documents, given the preexisting access over the subject lands. (2) The Gay Head Tribe members, first as grantees, and then as grantors, would not be expected to manifest expressed or implied intent regarding easements nor would intent be manifest in the governmental land transfers to the Tribe members, or in the later judicial partitioning process, which changed common ownership to yield individual deeds in severalty ownership to the Tribe members. (3) Even were we to disregard the history of common access as laying the predicate for easements by necessity to avoid landlocking, it is appropriate to turn to and follow § 2.15 of the Restatement, which provides that an easement by necessity exists where access would otherwise be cut off <u>unless the parties clearly indicate they intended a contrary result</u>. (4) Lastly, even apart from the Restatement, Massachusetts property common law also supports easements by necessity in the subject parcels.

    1. <u>The Gay Head Tribe's tradition of common access over the subject lands</u>. First, it is not disputed -- to the contrary it is definitely acknowledged on this record -- that the prevailing custom of the Gay Head Tribe was to allow its members access over the lands. There is no evidence in the record that this prevailing custom, prior to the governmental partition that occurred in the 1870's, did not continue after the land,

previously held in common, was partitioned and deeded to Tribe members.

In light of this land use fact as to which there is no dispute, any intent regarding affirmative easements would not have been expressed because there was no need to do so, with the extant Tribe members' common access over the lands.[4]  There is neither any basis to negate this undisputed fact, nor any basis to negate easements by necessity simply because way back in the historic lore -- which encompasses the Gay Head Tribe's common access paths, the Massachusetts governmental common land grants, and the judicially partitioned deeds changing the ownership to deeds in severalty -- there was not expressed or implied intent in the land history by the Gay Head Tribe grantees or grantors with respect to conveying easements by necessity to avoid creating landlocked parcels.  Again, the point to be emphasized is that, given the Tribe's ancient history of custom and practice, one would not likely discern or find intent, express

---

[4] We note that litigation involving these lands was before this court previously in Kitras v. Aquinnah, 64 Mass. App. Ct. 285 (2005) (Kitras I).  However, Kitras I did not address whether easements by necessity existed, and, if so, what the parameters of such easements would be.  Rather -- and it is an important rather -- the only issue decided in Kitras I was whether the United States was an indispensable party to the case.  This court held the United States was not a necessary party.  Because the easement by necessity questions were not the issue resolved by this court in Kitras I, we remanded to the Land Court to determine the easement question -- the precise question in this appeal.

or implied, to convey what already existed, in fact, by common access.

2.  The history of the Gay Head Tribe's common ownership, judicial partition, and the Tribe's members' individual rights by ownership in severalty.  Although quite arcane, it is important to consider the property form of ownership of the Tribe's lands before and after the 1870-1878 judicial partition.

First, the subject lands were held in common ownership[5] prior to the judicial partitioning process.  After the partitioning process, the lands were held in severalty.[6]  The deeds in severalty to the Tribe members/real parties in interest

---

[5] Lands held in common are held as "tenements by several and distinct titles . . . but occup[ied] in common, the only unity recognized . . . being that of possession."  Bouvier, Law Dictionary Adapted to the Constitution & Laws of the United States of America, and of the Several States of the American Union 580 (14th ed. 1882).  "[T]wo or more persons may have concurrent interests in the land; the common characteristic of all such interests being that the owners have no separate rights as regards any distinct portion of the land, but each is interested, according to the extent of his share, in every part of the whole land."  Tiffany, Law of Real Property & Other Interests in Land § 161, at 370 (1903).  Lands "granted in large parcels, to a great number of grantees . . . for the purpose of forming towns . . . have invariably, and from the earliest settlement of the country, been considered as vesting in the grantees and their heirs estates in common."  Higbee v. Rice, 5 Mass. 343, 350 (1809).

[6] An estate held in severalty is defined as "[a]n estate which is held by the tenant in his own right only, without any other being joined or connected with him in point of interest during the continuance of his estate."  Bouvier, supra at 517. "[I]nterests . . . in which the right to possession is in one person at a time . . . are called estates in severalty." Hopkins, Law of Real Property 332 (1896).

in the partitioning process, in our opinion, resulted in a "carry-through" of the preexisting right of common access of the Tribe members to their lands now held in severalty.

Turning first to the real parties in interest, the historic record demonstrates, and it is important to emphasize, that the real parties in interest to the partitioning process,[7,8] which led to the crafting of deeds in severalty to the Gay Head Tribe members, were not the commissioners, whose functions were administrative.[9] Indeed, given the administrative drafting mandate to the commissioners to divide and reformulate the Tribe's common lands to lands in severalty, one would not expect to see, and there are not to be seen, expressions of the

---

[7] Partition is the "dividing of lands held by . . . tenants in common, into distinct portions, so that they may hold them in severalty. . . . Partition is voluntary or judicial. . . . It is judicial when it is made by the authority of the court, and according to the formalities prescribed by law." Black's Law Dictionary 876-877 (2d ed. 1910).

[8] "In proceedings for partition, the court first determines the share to which each cotenant is entitled, and then the actual partition of the land by metes and bounds is made by commissioners . . . and their report, if satisfactory, is ratified by the court, and a final judgment or decree in accordance therewith is entered." Tiffany, supra at § 175, at 407.

[9] "The actual division of the land in partition is made by commissioners appointed by the court. . . . Probate courts . . . have power to make partition of estates over which they have acquired jurisdiction." Hopkins, supra at 345-346. In this case, Joseph T. Pease and Richard L. Pease were appointed commissioners in 1870.

commissioners' intent on easements yea or nay.  Intent was beyond the pale of the commissioners.

To be further noted in this land history are the legislative enactments which preceded the judicial partition of the Tribe's lands.  In 1869 and 1870, to address the inequity of Native Americans having limited land ownership rights under State law, the Legislature enacted St. 1869, c. 463, and St. 1870, cc. 213, 293, 350.  It is the 1870 statute[10] involving partition and common ownership that is important to consider in this case.  As to the subject lands at issue here, the process for division of the Tribe's common lands was set forth in St. 1870, c. 213, § 6:

> "The judge of probate of the county of Dukes-county, upon the application of the selectmen of Gay Head, or of any ten resident owners of land therein . . . if he shall adjudge that it is for the interest of said parties that any or all of the common lands of said town be divided, shall appoint two discreet, disinterested persons commissioners to make partition of the same, and their award, being confirmed by said court, shall be final in the premises."

As previously noted it was the Gay Head Tribe members who proceeded as the real parties in interest and filed petitions

---

[10] Pursuant to St. 1869, c. 463, Native American lands held in severalty became fee simple estates under State law.  See Danzell v. Webquish, 108 Mass. 133, 134 (1871) ("By recent legislation, the Indians of the Commonwealth have been fully enfranchised from the subjection in which they had heretofore been kept, and put upon the same footing as other citizens, and provision made for the division of their lands among them in severalty as their absolute property.  Sts. 1869, c. 463; 1870, cc. 213, 293, 350").

for partition of the common lands, which enjoyed common access by custom and practice. One petition in September, 1870, requests the court "to divide and set off our parts in severalty to us of all the common land in" Aquinnah. Another petition, dated October 17, 1870, states, "we shall be greatly benefited if our part of the common land in Gay Head be set off to us in severalty[11]. . . . We the undersigned . . . take this method to

---

[11] In construing a similar statute (St. 1870, c. 293, § 6) applying to the common lands of the Mashpee Wampanoag Tribe (Mashpee Tribe), the Supreme Judicial Court held that the common lands were to be held by the town, subject to partition and division of said common lands. In re Coombs, 127 Mass. 278, 280 (1879). As to the Mashpee Tribe's common lands, the court wrote as follows:

> "In pursuance of the policy established by the St. of 1869, the district . . . was incorporated as a town . . . and all common lands and other rights, belonging to the district, were transferred to the new town to be held as property and rights are held by other towns."

> ". . .

> "[I]t was not only a proper but a wise exercise of power for the Legislature to frame provisions by which common lands belonging to the town or the tribe, and the proceeds from the sale of such lands, should be divided. The Legislature could impose any reasonable qualifications or restrictions upon the privileges and powers conferred by the statute, either upon the town or upon the people. . . . [W]e are of opinion that it was the intention of the statute to provide a tribunal by which partition or sale of common lands could from time to time be directed; and that the power of the tribunal is exhausted only when all the common lands have been divided and sold." (Emphasis added).

Id. at 280-282.

request your honor to put us in possession of what belongs to us of the said common land" (emphasis added). It is, of course, not surprising that the newly enfranchised Tribe members, in this petition to enforce for the first time their now real and full well justified right to own property, did not in their petition express any intent concerning easements.

To complete the historic background, on December 5, 1870, a judge of the Probate Court decreed as follows:

> "It appearing to the Court that it would be for the benefit of the people of said Town of Gay Head that their said Common Lands should be divided as prayed for and as the Statute in that case provides, [i]t is decreed that said Lands be so divided."

Then, finally, on May 12, 1879, having completed the partition of the lands, the commissioners wrote as follows:

> "Not considering it best for the interests of the parties owning the lands [that is, the Tribe members] referred to in the for[e]going Warrant that any part thereof should be sold, in which opinion said parties unanimously concurred, we have set off and divided the same among the people [the Tribe members] entitled thereto" (emphasis added).

To end this aspect of this opinion, as demonstrated above, in these large scale governmental partitioning land transactions, the question of private grantor/grantee intent was not present. Simply put, this is not a case, such as is presented in general private land conveyances, where "the actual

---

However, specifically exempted from these provisions of the 1869 statute were "the Indians of Marshpee and Gay Head." Id. at 280, quoting from St. 1869, c. 463.

intention of the parties as disclosed by the oral testimony makes it plain that there was express understanding that there should be no right of way over other land of the grantor." Orpin v. Morrison, 230 Mass. 529, 534 (1918). Accordingly, our analysis must account for the Gay Head Tribe's preexisting access rights, which rights serve to establish that the Tribe's members understood that there were rights of way and access.

3.  The Restatement § 2.15 rule of law on easements by necessity. The implication of easements by necessity accord with the property law set forth in § 2.15 of the Restatement. The black letter rule of the Restatement § 2.15 provides as follows:

> "A conveyance that would otherwise deprive the land conveyed to the grantee . . . of rights necessary to reasonable enjoyment of the land implies the creation of a servitude granting . . . such rights, unless the language or circumstances of the conveyance clearly indicate that the parties intended to deprive the property of those rights."

Comment b to Restatement § 2.15 on easements further supports easements by necessity in this case:

> "Access rights are almost always necessary to the enjoyment of property. In a conveyance that would otherwise deprive the owner of access to property, access rights will always be implied, unless the parties clearly indicate they intended a contrary result. The most commonly implied access rights are those to connect property with a public road, but there are others."

Further, comment e to Restatement § 2.15 emphasizes that "[m]ere proof that [the parties] failed to consider access

rights, or incorrectly believed other means to be available, is not sufficient to justify exclusion of implied servitudes for rights necessary to its enjoyment."  See Restatement § 2.15 comment a (describing history and rationale of "[p]ublic policy favoring use and occupation of land").

Here, the Massachusetts governmental land grant and judicial partitioning process involved neither private negotiations nor parties on either side who likely would, or actually did, state or express intent concerning easements vis-a-vis the lands, and the parties certainly did not "clearly indicate that [they] intended to deprive the property of those rights."  Restatement § 2.15.

4.  <u>Massachusetts property law on easements by necessity follows Restatement § 2.15</u>.  Even were we not to adopt per se or follow Restatement § 2.15 as controlling, Massachusetts property law -- albeit developed in the context of private land conveyancing -- would still presume easements by necessity here.

The implied presumption in favor of easements by necessity over otherwise landlocked property underlying § 2.15 of the Restatement is in accord with the Massachusetts common law of property.  Thus, even if we declined to follow the Restatement, easements by necessity should exist here.  That the Tribe's land transfer involved governmental actions and a judicial

partitioning process does not alter the presumptions of a legal right of access under Restatement § 2.15 or Massachusetts law.

Under Massachusetts law, in a conveyance with the prospect of leaving property landlocked, there is presumed access by an easement by necessity, <u>absent contrary evidence rebutting the presumption and proving that the conveying parties did not intend access, but rather intended to cut off access and convey land that is landlocked</u>.  "The law presumes that one will not sell land to another without an understanding that the grantee shall have a legal right of access to it, if it is in the power of the grantor to give it, and it equally presumes an understanding of the parties that one selling a portion of his land shall have a legal right of access to the remainder over the part sold if he can reach it in no other way.  This presumption prevails over the ordinary covenants of a warranty deed."  <u>Davis</u> v. <u>Sikes</u>, 254 Mass. 540, 545-546 (1926), quoting from <u>New York & New England R.R.</u> v. <u>Railroad Commrs</u>., 162 Mass. 81, 83 (1894).  "A right of way of necessity over land of the grantor is implied by the law as a part of the grant when the granted premises are otherwise inaccessible, because that is presumed to be the intent of the parties. . . .  It is founded on the idea that it is the purpose of the parties that the conveyance shall be beneficial to the grantee. . . . It is, however, a pure presumption raised by the law."  <u>Orpin</u> v.

Morrison, 230 Mass. at 533. "'Easements by necessity' refer to rights-of-way presumed at common law when a landowner conveys a portion of his land but still needs access over the transferred property to reach the property he retained." Bedford v. Cerasuolo, 62 Mass. App. Ct. 73, 77 (2004). See generally Eno & Hovey, Real Estate Law § 8.14 (4th ed. 2004).

In conclusion, this record presents a historical background supporting the presumption of easements by necessity in that the original grantees, the members of the Gay Head Tribe, by custom and practice, enjoyed rights of access to cross over the subject lands. Further, the record also tracks the presumption in our State property law which favors easements by necessity to keep "free" lots from being landlocked. Accordingly, we reverse the judgment, and remand for further proceedings consistent with this opinion.

So ordered.

AGNES, J. (dissenting).  It is settled law necessity alone does not give rise to an implied easement.  Kitras v. Aquinnah, 64 Mass. App. Ct. 285, 298 (2005) (Kitras I), citing Nichols v. Luce, 24 Pick. 102, 104 (1834).  "Neither does there exist a public policy favoring the creation of implied easements when needed to render land either accessible or productive."  Ibid., citing Richards v. Attleborough Branch R.R. Co., 153 Mass. 120, 122 (1891).  As a result, conventional legal doctrine requires the plaintiffs to prove that at the time the partition deeds were approved by the Probate Court judge in 1878, there was an intent, shared by the parties, albeit unexpressed, to grant access easements in hundreds of deeds which were shown on the plan drawn by the commissioners as clearly landlocked.  Based on the record before us, I do not believe the plaintiffs met their burden to prove that the parties shared an intent to create access easements.  Indeed, for the following reasons, I believe there was no such shared intent:  (1) the glaring omission of access roads or paths not only on the nineteenth century partition plan, but also on contemporary plot maps which show that most of the set-off lots lack frontage or access to or from any public amenity; (2) the condition of the land at the time of partition, described as "uneven, rough, and not remarkably fertile," Kitras I, 64 Mass. App. Ct. at 288; (3) the expectation that these lots would "lie untilled and

comparatively unused" following the partition, Report of the Committee, 1869 Senate Doc. No. 14, at 5; (4) the fact that the Native American grantees shared a custom of free access over lands held in common by the tribe, and had no need for a reservation of access rights; and (5) the absence of any evidence that the Native American grantees did not continue to exercise and enjoy their tribal rights and customs following the partition.[1]  Therefore, I believe the decision of the Land Court judge should be affirmed.[2]

It may be that a presumption should exist that when land previously held in common by members of a Native American tribe is partitioned pursuant to an act of the Legislature,

---

[1] I also believe that respect for the comprehensive process that the commissioners and the probate judge engaged in more than 135 years ago to partition the land, and a regard for the certainty and predictability of land titles conferred by the town, suggests that we should proceed with caution "in determining whether the circumstances surrounding a government land grant are sufficient to overcome the inference prompted by the omission of an express reference to a reserved right of access."  Murphy v. Burch, 46 Cal. 4th 157, 165 (2009).

[2] The plaintiffs challenge the judge's declining to reconsider this court's conclusion in Kitras I that each of lots 1 through 188 or 189 were "owned by a different individual, and the unity of title required to imply an easement by necessity fails," Kitras I, 64 Mass. App. Ct. at 293, on the grounds that, because the finding was not necessary to the Kitras I court's decision, it is not binding under the doctrine of res judicata. However, under the doctrine of law of the case, that question was not open to reconsideration below, and we have not been presented with any persuasive reason to revisit it.  See Lunn & Sweet Co. v. Wolfman, 268 Mass. 345, 348-349 (1929).  See also United States v. Matthews, 643 F.3d 9, 12-13 (1st Cir. 2011).

preexisting tribal rights and customs are perpetuated and become binding on the successor grantees in perpetuity.  However, to date there is no such presumption under our law.  I believe that such an extraordinary alteration of traditional principles of Massachusetts law should be accomplished by the Supreme Judicial Court and not by this court.

What follows is a brief history of the events leading up to the 1878 partition, and a detailed analysis of the legal principles governing easements by necessity.

Background.  1.  Procedural history.  In Kitras I, this court considered whether the United States, which holds a number of lots in trust for the Wampanoag Tribal Council of Gay Head, Inc., a Federally recognized Native American Tribe (Wampanoag Tribe), was an indispensable party to the plaintiffs' action. This court held that the inability to join the United States as a party was not fatal because the Wampanoag Tribe had waived sovereign immunity in matters concerning the land at issue and could be sued directly.  Id. at 298.  However, because an easement by necessity ultimately depends on the facts, particularly the intent of the parties at the time of the conveyance (or, in this case, partition), this court reversed and remanded the matter for trial with instructions that the Land Court was to determine, after appropriate proceedings, whether (i) easements by necessity properly could be implied

from the circumstances attendant at the time of the lots' creation and in light of subsequent events; and (ii) if so, where such easements were located. Id. at 298-301. In doing so, this court cautioned that notwithstanding that each of the plaintiffs' lots is landlocked, a finding that an easement was intended by the parties in the circumstances of this case is not inevitable and the question "requires thoughtful consideration" by a fact finder of the "presumed objective intent of the grantor and grantee based upon the circumstances of the conveyance." Id. at 300, quoting from Flax v. Smith, 20 Mass. App. Ct. 149, 153 (1985). In addition, this court noted that even if the requisite intent is found, numerous questions remain including merger, extinguishment, lack of continuing necessity, and impacts of eminent domain takings. Ibid.

On remand, the judge ordered a bifurcation of the issues and first addressed whether the commissioners who partitioned the land in the 1870's in accordance with a legislative directive intended to create easements. The parties initially attempted to present the judge with an agreed statement of facts, but, when that failed, submitted the question on their respective documentary presentations. Correctly concluding that live testimony was unlikely to be helpful given the age of the matters in issue, the judge made comprehensive findings and rulings on the basis of a voluminous documentary record, and

determined that an intent to create easements could not reasonably be implied. Accordingly, on August 12, 2010, in accordance with his findings and rulings that there was no intent to create easements by necessity, the judge entered a judgment for the defendants; a "second amended and final judgment" was entered on May 17, 2011. The plaintiffs now appeal. In particular, the judge reasoned that (i) the condition of the land was such that access easements are not reasonably implied; (ii) the presence of some easements negates the imposition of an easement by necessity; and (iii) access easements were unnecessary because all the grantees in question were members of the Wampanoag Tribe of Gay Head (Gay Head Tribe or Tribe) and the Gay Head Tribe's custom at the time allowed access over all property by all members of the Tribe.

2. _Factual background._ In the 1800's, what is now known as Aquinnah in Martha's Vineyard was occupied nearly exclusively by the descendants of the Gay Head Tribe members. Located east of Chilmark on the island of Martha's Vineyard, it consisted of approximately 2500 acres of land; 450 of it held in severalty and occupied by Gay Head Tribe members, and the remainder held by the Tribe in common. _Kitras I_, _supra_ at 287. The judge correctly recognized that the lots were held by the Commonwealth under English common law rules of property and occupied by the

Gay Head Tribe under traditional Native American law.[3]

Importantly, he also recognized that the prevailing custom of the Gay Head Tribe was to allow all members access over all lands, whether held in common or in severalty.[4]

---

[3] The distinction between fee title and Native American Indian title is well settled. "American courts recognize two distinct levels of ownership in Indian lands: fee title and Indian title. The common-law fee title passed to the European sovereign at discovery, and it could be transferred by him to his grantees. The fee title in lands that the British king retained passed to the individual states at the time of the revolution. These states, in turn, ceded to the central government their claims to the western territories beyond their present boundaries. Title to Indian lands within their borders, however, was retained by the thirteen original states. . . . Indian title, which gave Indians a 'right of occupancy,' coexisted with the fee title." James v. Watt, 716 F.2d 71, 74 (1st Cir. 1983), cert. den., 467 U.S. 1209 (1984). Nevertheless, "[t]he rudimentary propositions that Indian title is a matter of federal law and can be extinguished only with federal consent apply in all of the States, including the original 13. It is true that the United States never held fee title to the Indian lands in the original States as it did to almost all the rest of the continental United States and that fee title to Indian lands in these States; or the pre-emptive right to purchase from the Indians, was in the State. But this reality did not alter the doctrine that federal law, treaties, and statutes protected Indian occupancy and that its termination was exclusively the province of federal law." Oneida Indian Nation of New York v. County of Oneida, New York, 414 U.S. 661, 670 (1974). In the absence of abandonment, only the sovereign has the power to extinguish aboriginal rights. County of Oneida, New York v. Oneida Indian Nation of New York State, 470 U.S. 226, 234 (1985).

[4] This is a finding of fact as to which there is no dispute. There is no evidence in the record that this practice among the members of the Gay Head Tribe prior to the partitions that occurred in the 1870's, did not continue after the partitions. I assume that it did.

During the first half of the nineteenth century, the Massachusetts Legislature was deeply involved in determining the future of the Gay Head Tribe. Attitudes gradually shifted from paternalistic treatment of the Native Americans toward granting them full citizenship and independent ownership of their lands.[5]

---

[5] Guardianship legislation was first passed in 1811. Provision was made for a partitioning of common lands as early as 1828, but it required approval of the Gay Head Tribe, which did not occur. A partitioning plan for lands of the Wampanoag Tribe of Marshpee (now Mashpee) (Mashpee Tribe) was established in 1842, see St. 1842, c. 72, but in a subsequent report known as the "Bird Report," 1849 House Doc. No. 46, the effort was considered a failure. The members of the Mashpee Tribe who had received title to land sold off the wood and were left with no means to support themselves. The Bird Report also noted that by comparison to other Native Americans in the area, "[t]he Gay Head Indians are differently situated. They live on a peninsula, and have little intercourse with the whites; consequently, they are more peculiar in their manners and customs, and are not so far advanced in the art and science of agriculture, as the two first-mentioned tribes [Chappaquiddick and Christiantown Tribes]." The Bird Report described the legal condition of land titles among the Gay Head Tribe members as "singularly anomalous." "None of the lands are held, as far as we could learn, by any title, depending for its validity upon statute law." Ibid. If a member of the Gay Head Tribe enclosed an area of unimproved common land with a makeshift fence "it belonged to him and his heirs forever." Ibid. The authors of the Bird Report "urge[d] particularly the importance of confirming the titles of proprietors of lands held in severalty, and of fixing the law of division and descent."

In 1859, John Milton Earle was appointed "to examine into the condition of all Indians and the descendants of Indians domiciled in this Commonwealth, and make report to the governor." St. 1859, c. 266. Leavitt Thaxter, a member of the Bird Commission, wrote to Earle regarding the Gay Head Tribe and the division of their lands: "I fear the consequences of any material change, especially relative to the Indians of Gay Head, who are differently situated than any others, especially, from their isolated position." In his report, 1862 House Doc. No.

In 1863, after some years of purported "guardianship," the Legislature established the "district" of Gay Head, see St. 1862, c. 184, § 4, and directed the clerk to create a "register of the lands of [the district], as at present held, whether in common or severally," and to identify the lots held in severalty and their owners. The following year, the Legislature appointed Charles Marston to "fully and finally . . . determine, all boundary lines between the individual owners of land located in the Indian district of Gay Head, . . . and also to determine the boundary line between the common lands of said district and the individual owners adjoining said common lands. St. 1863, c. 42. Marston was authorized, in particular, "to adjust, and fully and finally to settle, equitably, and as the interest of the petitioners and all other parties may require, all the matters, claims and controversies, now existing and growing out of or in connection with the boundaries of the aforesaid lands."[6] Ibid.

_____

215, Earle considered the earlier distribution of land in severalty to individual Mashpee Tribe members to have been "disastrous." Id. at 42. Earle concluded that the Native American traditional law employed in Gay Head, allowing as it did for ownership of land in common, rather than the Commonwealth's laws, "worked well." Id. at 44. In fact, Earle noted that the members of the Gay Head Tribe adhered to their unwritten tribal law regarding common ownership of property "with great tenacity, and are fearful of any innovations upon it." Id. at 34.

[6] The legislation further provided for hearing, following notice by publication, of all claims by interested parties, directed Marston to "make a report of his doings to the governor

It soon became apparent, however, that despite efforts to enfranchise the Gay Head Tribe members by conferring "the glorious privileges of Massachusetts citizenship in full,"[7] they

---

and council," and appropriated a sum not exceeding $100 as compensation for his services.  St. 1863, § 42.  Marston submitted a report in 1866, but was unable to complete his work.  However, he did create a book of records setting forth descriptions of a large portion of the lots of land, including the set-off of lots 1-173, which was recorded at the Dukes County registry of deeds in book 49, page 1.

[7] See St. 1869, c. 463, § 1 (granting the "Indians" within the Commonwealth "all the rights, privileges and immunities" of State citizens).  Massachusetts had ratified the Fourteenth Amendment to the United States Constitution in 1867.  The legislation explicitly stated that all lands "rightfully held by any Indian in severalty" as well as any land that "ha[s] been or may be set off to any Indian, shall be and become the property of such person and his heirs in fee simple . . . and all Indians shall hereafter have the same rights as other citizens to take, hold, convey and transmit real estate."  St. 1869, c. 463, § 2.  It is an oversimplification of a complex history to suggest, as the plaintiffs do, that as of 1869, the legal status of Native Americans was equivalent to the other citizens of the Commonwealth.  For example, the 1869 statute denied to the Gay Head Tribe the right to seek division of the common lands.  St. 1869, c. 463, § 3.  Also, the 1870 statute authorized, but did not mandate, the division of the common lands.  St. 1870, c. 213, § 6.  Under that statute, the common lands would remain undivided unless the selectmen or any ten resident land owners petitioned the local probate judge, who then had the discretion to determine whether to grant or deny the petition, the right of appeal from that decision being reserved.  Ibid.  In Drew v. Carroll, 154 Mass. 181, 183 (1891), the Supreme Judicial Court made this observation about the 1869 statute:  it "put them [the Indians], for the most part, on the basis of ordinary citizenship" (emphasis added).  In an earlier decision, In Re Coombs, 127 Mass. 278, 279-280 (1879), the Supreme Judicial Court stated that "[i]n thus enfranchising the Indians and conferring on them the rights of citizens, it was not the intention of the Legislature to give at once to the several tribes, or to the individual Indians composing those tribes, the

suffered from the "slight drawback that being neither a town by themselves, nor part of any other town," their privileges of citizenship "could neither be exercised or enjoyed."  Report of the Committee, 1870 Senate Doc. No. 14, at 1.  "To prepare the way for remedying this continuation of the "political anomaly," in 1869, the Legislature appointed a committee which "visited the people of that district, and carefully noted their condition, their prospects, their situation, their views and opinions."  Id. at 4.  The committee reported on all aspects of Gay Head and its citizens, including population, health, wealth, religion, education, occupations, physical characteristics of the land, and general well-being.

With regard to the land, the committee reported that in addition to the land held in severalty, "there is the large tract of some nineteen hundred acres held in common.  This land is uneven, rough and not remarkably fertile.  A good deal of it, however, is, or might be made, reasonably productive with a slight expenditure, and, doubtless, would be if the owners had the means; but, deficient as they are in 'worldly gear,' it is, perhaps, better that these lands should continue to lie in common for the benefit of the whole community as pasturage and berry lands, than to be divided up into small lots to lie

absolute and unqualified control of common lands occupied by them."

untilled and comparatively unused.  This, however, is a question of 'property,' which every 'citizen' should have the privilege of determining for himself, and the people of Gay Head have certainly the right to claim, as among the first proofs of their recognition to full citizenship, the disposition of their landed property, in accordance with their own wishes.  Accordingly we have inserted in the bill accompanying this Report, a section making the same provision for a distribution of their lands as was made last year for the other tribes."  Id. at 5.

The committee unanimously recommended that Gay Head be made a town of the Commonwealth.  In addition, the committee noted that the deplorable condition of the road leading from Chilmark across Gay Head "to the United States light-house [on the eastern end of] Gay Head" greatly isolates the community and also makes it difficult for visitors to Martha's Vineyard to view the lighthouse.  Id. at 9.  The committee recommended that the Commonwealth shoulder the financial burden of putting the road "in good travelling order."  Id. at 10.

Following receipt of the committee's report, the Legislature enacted St. 1870, c. 213, which incorporated Gay Head as a town and directed that "all common lands, common funds, and all fishing and other rights held by the district of Gay Head are hereby transferred to the town of Gay Head, and shall be owned and enjoyed as like property and rights of other

towns are owned and enjoyed."  St. 1870, c. 213, § 2.  It further directed that the county commissioners shall "lay out and construct a road from the line of Chilmark and Gay Head to the light-house on Gay Head."  St. 1870, c. 213, § 5.  In addition, the statute provided that upon application of the board of selectmen or any ten citizens, a judge of the Probate Court may partition the common lands of the town and divide or sell the lands.  St. 1870, c. 213, § 6.  Notably, this legislation did not purport to extinguish any tribal rights or privileges enjoyed individually or severally by the Gay Head Tribe.[8]

In 1870, a group of more than ten citizens petitioned the Probate Court to divide and set off the common land.  The probate judge appointed Joseph L. Pease and Richard L. Pease as commissioners (commissioners) to partition the property, and specifically ordered them to "give to all parties interested due notice of the times and places appointed . . . for making such division, and establishing such boundaries and lines."  In their

---

[8] It appears that it was not until 1987, when Congress passed 25 U.S.C. § 1771, that aboriginal rights formally were extinguished retroactive to the date of transfer by any member of the Gay Head Tribe.  See Building Inspector & Zoning Officer of Aquinnah v. Wampanoag Aquinnah Shellfish Hatchery Corp., 443 Mass. 1, 3 (2004).  See also St. 1985, c. 277 ("An Act to Implement the Settlement of Gay Head Indian Land Claims").  There is no support in the record for the claim by the plaintiffs that the Legislature knew that all tribal and aboriginal rights were extinguished prior to the partition.

report to the Probate Court, the commissioners reported that "the almost unanimous desire of the inhabitants" was "to leave cranberry lands near the sea-shore and the clay in the cliffs undivided," but to divide the rest of the common property.

Under the direction of the commissioners, a plan of over 500 properties, the first 189 of which had been previously divided as held severally by individual Gay Head Tribe members, was created and approved by the Probate Court in 1878. One road is shown on the map running from Gay Head's southeastern border with Chilmark between Menamsha Pond and Squibnocket Pond to the northwest end of the peninsula where it meets the Vineyard Sound (at the likely location of the lighthouse). All of the properties at issue lie to the south of this road. Even a cursory view of the grid-like plan created by the commissioners reveals the landlocked nature of the vast majority of the lots, other than those relatively few lots that abut the road.

The parties agree that the partition deeds contained no access easements.[9] The parties further agree that some of the partition deeds, however, did include a reservation over three lots (382, 384, 393) "for the use of the proprietors in the Herring Fishery, for the purpose of fishing and clearing the creeks, a strip of land, one rod wide, on each side of the

---

[9] Curiously absent from the record are the actual partition deeds and any subsequent deeds from the original Gay Head Tribe grantees.

creek, so long as the said reservation may be needed for that purpose." Many others explicitly granted to certain individuals, some identified and some not, the right to the peat on various lots partitioned to others.[10] In 1955, a taking was made by the Commonwealth for the purpose of laying out the Moshup Trail, which gave access to some of the lots now owned by the defendants. Another road, Zack's Cliffs Road, also now exists and intersects with Moshup Trail. The plaintiffs' properties do not abut these ways.

Discussion. 1. The plaintiffs have not met their burden to prove the existence of an intent to create easements at the time of the partition.

> "A right of way of necessity over land of the grantor is implied by the law as a part of the grant when the granted premises are otherwise inaccessible, because that is presumed to be the intent of the parties. The way is created, not by the necessity of the grantee, but as a deduction as to the intention of the parties from the instrument of grant, the circumstances under which it was executed and all the material conditions known to the parties at the time. The rule has its basis in a construction of the deed with reference to all the facts within the knowledge of the parties respecting the subject of the grant, to the end that their assumed design may be carried into effect. It

---

[10] So, for example, the description of lot 193 includes a statement "[r]eserving however any right or rights to peat on the premises that may justly belong to any person or persons, to them, their heirs and assigns," and the description of lot 218 includes a statement of such rights "to William Jeffers, his heirs and assigns." Similar language is found in descriptions for lots 221, 225, 240-241, 244-246, 254, 277, 293-296, 298, 304, 306-308, 311, 321, 329, 334, 340, 351-356, 365-366 1/2, 369, 378, and 419.

> is founded on the idea that it is the purpose of the parties that the conveyance shall be beneficial to the grantee."

Orpin v. Morrison, 230 Mass. 529, 533 (1918).

It being "a pure presumption raised by the law," an intent to grant or reserve an easement by necessity "ought to be and is construed with strictness. There is no reason in law or ethics why parties may not convey land without direct means of access, if they desire to do so." Ibid. "The burden of proving the intent of the parties to create an easement that is unexpressed in terms in a deed is upon the party asserting it, and, when the evidence establishes the requisite intent, 'it is now settled that the necessity of the easement for the enjoyment of the land conveyed is not an absolute physical necessity, but no more than a reasonable necessity.'"[11] Oldfield v. Smith, 304 Mass. 590, 594 (1939), quoting from Mt. Holyoke Realty Corp. v. Holyoke Realty Corp., 284 Mass. 100, 105 (1933).

I disagree with a major premise of the arguments advanced by the plaintiffs, namely, that only two factors were relevant to the fact finder's determination: (i) that the lots were, before partition, held by a single grantor; and (ii) as a result of the partition, the lots in question were landlocked. As this

---

[11] In Krinsky v. Hoffman, 326 Mass. 683, 688-689 (1951), the Supreme Judicial Court noted some inconsistency in its cases as to whether the necessity required is a "reasonable necessity" or a "strict necessity." Here, nothing turns on the degree of necessity required to imply an easement.

court explained in Kitras I and in the cases cited above, far more than these two basic factors go into the calculus when determining probable intent as a foundation for a determination of whether there exits an easement by necessity. See Kitras I, supra at 298-300. Indeed, what was said in Kitras I bears significantly on the decision in this case. In Kitras I this court noted that while an assumption of intent to create easements "seemingly arises naturally from the necessity created by dividing the common land," "necessity alone does not an easement create," and "our charge . . . is not to look simply at the necessity, but to consider all 'the circumstances under which [the severance] was executed and all the material conditions known to the parties at the time.'" Id. at 298-299, quoting from Orpin v. Morrison, 230 Mass. at 533. See Richards v. Attleborough Branch R.R. Co., 153 Mass. 120, 121-122 (1891) (law does not prevent owner from cutting himself off from all access to his land by conveyances if that is his intent); Gorton-Pew Fisheries Co. v. Tolman, 210 Mass. 402, 411 (1912) (it is not necessity that creates way, but intention of parties as shown by their instruments and situation and circumstances with reference to which those instruments were made); Perodeau v. O'Connor, 336 Mass. 472, 474-475 (1957) (necessity merely one element to determine intention); Harrington v. Lamarque, 42 Mass. App. Ct. 371, 375 (1997). This court added that "in the

unique circumstances of this case, the fact that certain lots were landlocked as a result of partition does not persuade us as being the definitive measure of intent." Kitras I, supra at 299. This court also reminded the parties that "it is the proponents' burden to prove the existence of an implied easement." Id. at 300.

Now, after all the evidence has been presented and the case has been considered on the merits, I believe the judge ruled correctly that the plaintiffs did not meet their burden of proof as to whether there was an intent to create the claimed easements by necessity, and any presumption to the contrary has been successfully rebutted. See Mass. G. Evid. 301(d) (2014). This is not to say that the commissioners who partitioned the property were unmindful of whether the citizens of Gay Head had access to their lots. Rather, the officials involved in the design and implementation of the partition understood that the members of the Gay Head Tribe enjoyed access rights under tribal custom and practice. Thus, the most reasonable view of the state of mind of those involved in the partition is that there simply was no need for easements.

At the time the partition deeds were granted, the parties were aware that Gay Head tribal custom was such that all Tribe members enjoyed access over all Tribe properties whether owned severally or in common. The record contains no evidence that

suggests that this practice was to end (or ended) upon partition of the common property. Indeed, there is evidence that Native American custom and law superseded State law with respect to a Tribe member's property rights in relation to other members of the Tribe well after the partition occurred in the 1870's. See Cornwall v. Forger, 27 Mass. App. Ct. at 340-341. That this issue has arisen only some 135 years later, suggests that following the partition, access rights to and over the land continued to be exercised in accordance with tribal custom. "The practical construction given the deed by the parties as shown by their subsequent conduct may . . . be considered." Murphy v. Donovan, 4 Mass. App. Ct. 519, 527 (1976).

In addition, the record reflects that the partitioning of the Gay Head Tribe's land was the result of a methodical process that unfolded over most of the nineteenth century and was presided over by commissioners who clearly were aware of how to create an easement and who had input from the citizens of the town of Gay Head. As the judge concluded, the absence of access easements in the face of other express easements, "negate[s] any presumed intent of the grantors to create an easement by necessity for any of Plaintiffs' lots."[12] See Joyce v. Devaney,

---

[12] Because I believe the judge was correct in his ultimate conclusion that no easements by necessity existed due to lack of any intent to create such easements, I do not think it is necessary to address the plaintiffs' argument regarding the

322 Mass. 544, 549 (1948) ("The creation of such express easements in the deeds negatives, we think, any intention to create easements by implication").  I note, as well, that earlier partitions of other tribal lands on Martha's Vineyard did create a roadway system, making the glaring absence of such provisions here appear intentional.

    2.  <u>Massachusetts law is consistent with the Restatement (Third) of Property (Servitudes)</u>.  Section 2.15 of the Restatement (Third) of Property (Servitudes) (2000) (Restatement)[13] provides that an easement or servitude not expressly granted in a conveyance of land will be implied by judicial action if it is determined that otherwise the grantee will be deprived of rights necessary to reasonable enjoyment of the land.  Comment a to § 2.15 of the Restatement informs us that this principle embodies the common law.  Comment c to § 2.15, consistent with Massachusetts common law, informs us that a servitude or easement will be implied only when "prior to the conveyance, the property did enjoy such rights and that,

---

exclusion of certain materials allegedly demonstrating that lot 178 was part of the commonly owned land and thus ought to be considered eligible for potential easements.

    [13] Section 2.15 of the Restatement reads as follows:  "A conveyance that would otherwise deprive the land conveyed to the grantee, or land retained by the grantor, of rights necessary to reasonable enjoyment of the land implies the creation of a servitude granting or reserving such rights, unless the language or circumstances of the conveyance clearly indicate that the parties intended to deprive the property of those rights."

absent the implied servitude, the conveyance would deprive it of such rights."  In other words, under § 2.15 of the Restatement, the necessity requirement for an implied easement must arise at the same time as the conveyance.  See Restatement § 2.15 comment c ("Servitudes by necessity arise only on severance of rights held in a unity of ownership"); American Small Bus. Inv. Co. v. Frenzal, 238 Va. 453, 456 (1989).  This court previously decided that the requirement that the necessity must exist at the time of the conveyance applies regardless of whether the grantor is a government or private entity.  Kitras I, 64 Mass. App. Ct at 292 n.5.

As discussed above, the members of the Gay Head Tribe had no need for an access easement following the partition in the 1870's because they enjoyed a right of access to and over the land in question as a result of tribal custom and practice. This state of affairs thus precludes the plaintiffs from establishing an essential element of the required proof, namely, that the need for an easement existed at the time of the original deed.  See Nichols v. Luce, 24 Pick. at 104 ("It is not the necessity which creates the right of way, but the fair construction of the acts of the parties"); Orpin v. Morrison, 230 Mass. at 534 (in upholding judge's decision that no easement by necessity should be implied even though parcel lacked access to any public or private road, court stated that "[t]here are

circumstances in the case at bar which apart from the oral testimony give color to the contention that the parties did not intend a right of way by necessity"); Darman v. Dunderdale, 362 Mass. 633, 639-640 (1972) (eminent domain taking cutting off access does not give rise to easement by necessity when necessity did not exist at time of original conveyance); Swartz v. Sinnot, 6 Mass. App. Ct. 838, 838-839 (1978) (no easement by necessity where necessity arose later by virtue of railroad cutting off access to public way; convenience alone does not give rise to easement by necessity); New England Continental Media, Inc. v. Milton, 32 Mass. App. Ct. 374, 378 (1992) (subsequent eminent domain taking does not give rise to easement by necessity).

Conclusion. That the access the original owners enjoyed following partition does not continue today does not give rise to an inference of necessity when the partition was made. The plaintiffs have framed their argument in part on the basis of contemporary views about the utility and value of landlocked parcels in proximity to the ocean on an island that has become principally a recreational destination, rather than the condition of the land in the nineteenth century at the time of the partition when it was considered uneven, rough, and infertile. Necessity must be derived from the facts known by the parties at the time of the partition "to the end that their

assumed design may be carried into effect." Kitras I, supra at 291 (quotation omitted). See Mt. Holyoke Realty Corp. v. Holyoke Realty Corp., 284 Mass. at 104 (existence of easement by necessity must be determined "from the terms of the instrument and from the circumstances existing and known to the parties at the time the instrument of conveyance was delivered"). The doctrine of easement by necessity does not spring forth from a public policy against ownership of landlocked land. See Kitras I, supra at 298. See also Yellowstone River, LLC v. Meriwether Land Fund I, LLC, 362 Mont. 273, 291-293 (2011). The doctrine of easement by necessity was not recognized in order to vindicate the interests of the grantees. Instead, the doctrine is designed "to effectuate the intent of the parties." Ward v. McGlory, 358 Mass. 322, 325 (1970).

To allow contemporary circumstances to inform a determination of the intent of the parties at the time of a conveyance of land more than a century earlier contravenes the overarching principle that "[t]he aim of all interpretation of writings is to ascertain the meaning intended to be attached to the words by the parties who used them, and to effectuate the true purpose of the parties as thus ascertained. All rules are ancillary to that dominating aim." Clark v. State St. Trust Co., 270 Mass. 140, 151-152 (1930). Indeed, the canonical guides to construction of a written instrument are "[j]ustice,

common sense and the probable intention of the parties." Shane

v. Winter Hill Fed. Savs. & Loan Assn., 397 Mass. 479, 483

(1986), quoting from Stop & Shop, Inc. v. Ganem, 347 Mass. 697,

701 (1964).[14]

For these reasons, I respectfully dissent.

----

[14] There is no basis for reliance on comments b and e to § 2.15 of the Restatement. Comment b has no application to the facts in this case because, as discussed in the text, the 1870's partition did not deprive the grantees of access to the land conveyed. Comment e also has no application to the facts in this case because it merely recognizes that when parties to a conveyance of land fail to consider access rights with the result that the parcel conveyed is landlocked a rebuttable presumption of an implied easement arises. There is evidence in this case, discussed in the text, that the failure to include access easements in most of the deeds was not the result of mere oversight. Some of the partition deeds did include easement rights. Moreover, even a cursory examination of the grid-like plan prepared by the commissioners reveals that access to the vast majority of lots that did not abut the road running from Gay Head to the northwest end of the peninsula would be a problem in the absence of an alternative arrangement, namely the tribal custom and practice which allowed the Gay Head Tribe grantees to pass over the land of other Gay Head Tribe members. A broad reading of comment e as the expression of a public policy that there is a presumption of an easement by necessity merely on a showing that a conveyance of land does not include a right of access, is contrary to settled Massachusetts law, which insists that the party seeking judicial recognition of an easement by necessity prove that it was the intention of the parties. An expansive, public policy based approach to the scope of the doctrine of easement by necessity under § 2.15 of the Restatement has been criticized as unsound and an alteration of the common law. See Hernandez, Restating Implied, Prescriptive & Statutory Easements, 40 Real Prop., Prob. & Tr. J. 75, 82 (2005).